39 So.3d 1234 (2010)
Victor CARABALLO, Appellant,
v.
STATE of Florida, Appellee.
No. SC07-1375.
Supreme Court of Florida.
June 24, 2010.
*1238 Carlos J. Martinez, Public Defender, and Andrew Stanton, Assistant Public Defender, Eleventh Judicial Circuit, Miami, FL, for Appellant.
Bill McCollum, Attorney General, Tallahassee, Florida, Sandra Jaggard, and Lisa A. Davis, Assistant Attorneys General, Miami, FL, for Appellee.
PER CURIAM.
This case is before the Court on appeal from a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons explained below, we affirm Caraballo's convictions; however, we reverse his death sentence and remand this case to the trial court for a new penalty phase.

OVERVIEW
Victor Caraballo (Caraballo) was convicted of the 2002 first-degree murder, kidnapping, robbery, and sexual battery of Ana Maria Angel (Angel). Caraballo was also convicted of the attempted first-degree murder, robbery, and kidnapping of Nelson Portobanco (Portobanco). At the conclusion of the penalty phase, the jury recommended by a vote of nine to three that Caraballo be sentenced to death for the murder of Angel. We affirm Caraballo's convictions and sentences as to all crimes except for the death sentence for the murder of Angel. As to the death sentence, because of error that occurred during the penalty phase, we reverse Caraballo's death sentence and remand this case to the trial court for a new penalty phase. We first discuss the facts of the murder and the investigation as well as the procedural posture of the case. Next, we discuss the guilt phase issues raised by Caraballo. We then turn to the penalty phase issue which dictates reversal of Caraballo's death sentence.

Facts of the Murder
The evidence presented at trial established that on Saturday, April 27, 2002, Angel and her boyfriend Portobanco, both high school students, went on a dinner date. After dinner, the two went for a walk on Miami Beach that lasted about thirty minutes. Around 12:30 a.m. on April 28, they decided to leave the beach and go home. As Angel and Portobanco walked to their car, they were accosted at gunpoint and forced into the rear cab of a white Ford F-150 pickup truck by a group of five men that included Victor Caraballo, Joel Lebron, Hector Caraballo, Cesar Mena, and Jesus Torres Roman.[1] The *1239 group had traveled from Orlando to Miami Beach on the evening of April 27 in the truck which was rented in Orlando on the morning of April 27. The evidence presented at trial established that Mena was the driver and Caraballo was the front seat passenger. Hector Caraballo, Lebron, and Roman sat in the rear cab of the truck with Angel and Portobanco. While in the truck, Angel and Portobanco were robbed of their belongings which included Angel's purse, cell phone, Florida identification card, automatic teller machine (ATM) card, various items of jewelry, and Portobanco's wallet and cell phone. After forcing Angel to reveal her personal identification number (PIN), the robbers used her ATM card to withdraw money from an ATM and to purchase gasoline.
Thereafter, the truck entered Interstate 95 and proceeded in a northerly direction with Angel and Portobanco trapped in the rear cab. At one point, Portobanco was told to kiss Angel and then to touch her in an intimate manner. When Portobanco refused, he was pushed onto the floorboard. Angel was then brutally gang-raped by the other three occupants of the rear cab. Thereafter, Caraballo exclaimed that it was his turn, climbed into the back seat, and sexually battered Angel.
After the sexual attacks ended, the truck continued traveling north and then stopped alongside the interstate. Portobanco was forced out of the truck and down an embankment. There, he was repeatedly stabbed and left for dead. One of Portobanco's multiple stab wounds was located extremely close to an artery. Thereafter, the truck continued to travel north on the interstate for several more miles with Angel still trapped inside. When the truck stopped again, Angel was forced out of the truck and taken to a retaining wall alongside the interstate. There, Angel was forced to her knees and was shot once in the back of her head killing her instantly.
After brutally stabbing Portobanco and fatally shooting Angel, the group of five headed back home to Orlando during the early morning hours of April 28. The rental truck was returned to the rental agency in Orlando that same day.

The Initial Investigation and Encounter with Caraballo
Portobanco, who did not succumb to his injuries, made his way to the side of the road and summoned help. There, a passerby stopped and emergency personnel were called. Portobanco was taken to a Miami hospital where he talked with law enforcement officers while being treated. Portobanco told the officers about the kidnapping and explained that when he last saw Angel, she was alive. After law enforcement officers obtained the numbers for both Angel's and Portobanco's cell phones, a call was traced from one of the phones to a residential telephone number at the Hawthorne Village Apartments in Orlando. The phone number was linked to Hector Caraballo.
Given that information, during the morning of April 28, local and statewide law enforcement officers set up a staging area in south Orange County in the vicinity of the Hawthorne Village Apartments. Although the officers did not locate Hector Caraballo, the Hawthorne Village staff informed them that a person named Victor Caraballo was recently a tenant in the complex. Apartment staff told law enforcement *1240 that Caraballo had been evicted and that his apartment should be vacant.
Law enforcement officers went to the apartment formerly rented by Caraballo and knocked on the door. Hawthorne Village staff, who accompanied the officers to the apartment, discovered that someone placed a new noncompliant lock on the apartment door. Despite multiple attempts to get the attention of anyone who might be inside, no one came to the door. Thereafter, with the consent of Hawthorne Village staff, law enforcement officers kicked in the door and entered the apartment. Once inside the apartment, they discovered that the door had been barricaded with a piece of wood and a hydraulic jack, and they discovered someone who identified himself as Victor Caraballo.

Statements Made at the Apartment
Caraballo, whose primary language is Spanish, identified himself as Victor Caraballo and also verified that Hector Caraballo was his brother. Agent Francisco Hidalgo, a Spanish-speaking Florida Department of Law Enforcement (FDLE) agent, was brought to the apartment to speak to Caraballo. Around 4:10 p.m. on April 28, Caraballo was advised in Spanish of his Miranda[2] rights, and after indicating that he understood his rights, he signed a waiver form printed in Spanish. Caraballo acknowledged that he and four others (Hector Caraballo, Mena, Lebron, and Roman) traveled to Miami Beach the evening before and robbed a young couple. Caraballo stated that Portobanco was beaten and left at some point during the trip back to Orlando, but he claimed that Angel traveled back to Orlando with the group and that she begged to be let go throughout the trip. Caraballo admitted to having some of the items belonging to Angel and Portobanco. He showed Agent Hidalgo where various items were located in the apartment, including Portobanco's wallet and Angel's purse, cell phone, and ATM card. In an abundance of caution, Hidalgo also obtained consent from Caraballo to search the apartment and seize the items. That evening, Caraballo was taken to the Orlando FDLE office where he made another statement.

Statements Made at the FDLE Office
Around 10 p.m. on April 28, Caraballo was questioned in the presence of Miami Beach Police Detective Larry Marrero and FDLE Agent Hidalgo. Caraballo admitted certain facts regarding the kidnapping, robbery, rape, and attempted murder, but he did not admit that Angel was shot and killed. Throughout the evening of April 28 and into the morning of April 29, additional information was gathered and others in the group of five were brought in for questioning. During that time, it was revealed that Angel was murdered and that her body was left along Interstate 95, several miles from where Portobanco was stabbed and left for dead. Using this information, law enforcement located Angel's body.

Caraballo's Television Interview
Between the time that Caraballo was arrested and put on trial, he participated in an interview with a local Spanish-language television station. During the interview, Caraballo said that he did not anticipate what happened that night because he and the others were only supposed to go to a discotheque and have fun. Caraballo also told the interviewer that Angel and Portobanco were violently forced into the pickup truck and that Lebron had a gun, possibly a .45 caliber or other type of gun with a magazine.
Caraballo recalled that Angel pleaded for her life and that Roman bragged about the impact of the gunshot wound. Caraballo *1241 also pointed to Lebron as the person who stabbed Portobanco. Additionally, Caraballo demonstrated how Angel was shot in the back of her head. Portions of Caraballo's interview were introduced at trial.[3]

Caraballo's Voluntary Confession Letter
Several months after the murder, Caraballo wrote a letter which contained a "voluntary confession" and sent it to the State Attorney's Office. In the confession, Caraballo said that on April 27 he was at his brother Hector's apartment when Mena, Lebron, and Roman came over. The group decided to go to a discotheque in Miami. Before leaving Orlando, they stopped at Mena's home at about 4:30 p.m. to get money for gasoline and say goodbye to Mena's wife.
At 6 p.m. the group left for Miami, stopping on the way to buy orange juice and vodka. At approximately 7 p.m., Mena asked Caraballo to drive the rest of the way to Miami, and Mena would resume driving once they arrived in Miami because he knew his way around the city. They arrived at the discotheque at approximately 10:30 p.m., only to discover that they did not have enough money for everyone to get in. The group, according to Caraballo, then devised a plan to sneak in the back door and went for a walk on the beach to wait for the club's security guards to be distracted. Caraballo added that when this plan proved to be unworkable, Mena, Lebron, and Roman decided that they should rob someone to get money and credit cards. Mena told them that he had two guns, a .38 caliber and a .45 caliber. Soon thereafter, Roman noticed two people (Angel and Portobanco) walking on the beach. Mena, according to Caraballo, suggested that they rob these two people. Lebron approached the couple with the .45 caliber and Roman with a knife and forced them into the truck. Angel begged Lebron not to hurt them, and Lebron and the others responded that no one would be hurt as long as Angel and Portobanco did what they were told.
Mena got in the driver's seat and Caraballo got in the front passenger seat. Lebron, Roman, Hector Caraballo, Angel, and Portobanco were in the rear cab of the truck. Angel and Portobanco's belongings were taken from them. Lebron asked Portobanco about his job, and Portobanco responded that his father, who was in the construction business, kept all of his money. The group stopped at a gas station and Mena asked for the PIN to Angel's ATM card. Caraballo said that he and Mena went to the ATM and withdrew a total of $160 from Angel's account. Mena also used the card to purchase $35 worth of gas. Caraballo claimed that he asked Angel and Portobanco if they knew how to swim and suggested to the others that they leave the couple at a river or a canal. This suggestion, according to Caraballo, was ignored by the others.
At one point, Lebron told Portobanco to make love to Angel, and Portobanco refused. Lebron asked Angel if she had made love before, and Angel said no. She told Lebron that when she was eight years old she was sexually molested twice by her stepfather. Lebron pointed the pistol at Angel and told her to take off her panties. Angel was crying and afraid, but she did as she was ordered to do. Lebron then told the group that they were all going to have sex with Angel. Lebron raped Angel anally, Roman raped her vaginally, followed by Hector Caraballo. Caraballo claimed that he did not penetrate Angel *1242 because Hector Caraballo had AIDS. Rather, Caraballo said, he masturbated and ejaculated on Angel. Caraballo claimed that he was forced to do all of this because Lebron threatened him.
The truck stopped and Lebron said that they were going to kill Angel and Portobanco. Mena told Lebron to take the knife with him. According to Caraballo, he got out of the truck and positioned himself between Lebron and Portobanco and tried to convince Lebron not to kill him or Angel. Lebron, however, pushed him out of the way and began to stab and kick Portobanco. Caraballo said that at one point he told Lebron that Portobanco was dead, even though he (Caraballo) knew that Portobanco was pretending to be dead.
Caraballo and Lebron then returned to the truck, and the group kept traveling. Angel asked if they killed Portobanco, and Lebron said "no," but Angel saw blood on his hands. According to Caraballo, Angel cried and asked them not to kill her. Fifteen minutes later, Mena stopped the truck, and Lebron, Roman, and Angel got out. According to Caraballo, Angel screamed for them not to kill her, but they did not listen. They took Angel to an area along the interstate shielded by foliage where Caraballo saw Lebron shoot Angel in the head.
When Lebron and Roman returned to the truck, Roman bragged about the size of the hole in Angel's head. According to Caraballo, when Lebron remarked that Angel and Portobanco were not the only ones who would be killed, Caraballo became very nervous and told Mena to drive. The group reached Hector Caraballo's house in Orlando about 6 a.m., and Caraballo went to his former apartment. Lebron, Mena, and Roman left in the truck to go home. Caraballo said that no one manipulated him to write the letter and that the confession was voluntary. Aware of the prejudice and the possible sentence, Caraballo offered to become a witness for the State. Caraballo's written confession was introduced into evidence at trial.

PROCEDURAL HISTORY
Caraballo and the four others were each indicted for Angel's murder.[4] Each codefendant faced seven counts: first-degree murder of Angel; attempted first-degree murder of Portobanco; two counts of kidnapping; two counts of armed robbery; and sexual battery of Angel.[5] In April 2007, Caraballo was tried by jury in a trial separate from his codefendants. After Caraballo was convicted of all seven counts, the trial proceeded to the penalty phase. During the penalty phase, the State presented Angel's mother as a witness. Caraballo presented testimony from three family members and two mental health experts. In addition to evidence in support of mitigating factors, Caraballo also presented evidence in support of his claim of mental retardation. The State then presented rebuttal testimony from two mental health experts. At the conclusion of the penalty phase, by a vote of nine to three, the jury issued its advisory recommendation that Caraballo be sentenced *1243 to death. The trial court held a Spencer[6] hearing where Angel's mother and Caraballo testified. Following the Spencer hearing, the court sentenced Caraballo to death.
At sentencing, the court found five aggravating factors: (1) Caraballo was convicted of a prior violent felony, based on Caraballo's contemporaneous convictions for the attempted first-degree murder, armed robbery, and kidnapping of Portobanco (great weight); (2) the defendant engaged in robbery, sexual battery, or kidnapping at the time of the murder (great weight); (3) the murder was committed to avoid arrest (great weight); (4) the murder was committed for pecuniary gain (some weight); and (5) the murder was especially heinous, atrocious, or cruel (HAC) (great weight).
The court then found two statutory mitigating factors: (1) no significant history of prior criminal activity (little weight); and (2) extreme mental or emotional disturbance (great weight).
As nonstatutory mitigation, the court found: (1) Caraballo had a deprived and abusive childhood (some weight); (2) Caraballo lacked a prior criminal history (no weight because this was already considered as a statutory mitigating factor); (3) Caraballo was not the shooter (some weight); and (4) Caraballo's general mental health (great weight).
Concluding that Caraballo was not mentally retarded, that sufficient aggravating factors were present to justify a death sentence, and that the mitigating factors did not overcome the aggravating factors, the court sentenced Caraballo to death.

ANALYSIS
On direct appeal, Caraballo raises nine issues, some of which relate to the guilt phase and some to the penalty phase of his trial. In summary, these issues are: (1) whether the entry into the apartment where Caraballo was found violated his Fourth and Fourteenth Amendment rights, rendering the fruits of the entry, search, and seizure inadmissible; (2) whether the interrogation of Caraballo violated his Miranda rights; (3) whether certain prosecutorial comments were improper; (4) whether the State's victim impact testimony deprived Caraballo of due process; (5) whether the trial court erred in permitting penalty phase testimony from an expert appointed to evaluate Caraballo's competence to proceed; (6) whether Florida law prevented Caraballo from establishing mental retardation; (7) whether Caraballo's death sentence violates Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); (8) whether the cumulative effect of errors committed at trial deprived Caraballo of a fair trial; and (9) whether Caraballo's death sentence is proportional.
At the outset, as we are bound to do in every death case, we review this case to determine whether sufficient evidence existed to justify Caraballo's convictions. We then continue with Caraballo's guilt phase claims and proceed to the penalty phase.

Sufficiency of the Evidence as to Caraballo's Convictions
"In appeals where the death penalty has been imposed, this Court independently reviews the record to confirm that the jury's verdict is supported by competent, substantial evidence." Davis v. State, 2 So.3d 952, 966-67 (Fla.2008) (citing Fla. R.App. P. 9.142(a)(6)). "In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the *1244 State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." Simmons v. State, 934 So.2d 1100, 1111 (Fla. 2006) (quoting Bradley v. State, 787 So.2d 732, 738 (Fla.2001)). Although Caraballo did not expressly challenge the sufficiency of the evidence as to each of his convictions, we conclude that sufficient evidence was presented at trial for the jury to find Caraballo guilty of all seven felonies.
The State presented evidence that Caraballo was among a group of five men who accosted Angel and her companion, Portobanco, at gunpoint and forced them into a pickup truck. The men forced Angel and Portobanco to turn over their belongings, and Caraballo himself admitted to using Angel's ATM card. Further evidence was presented that Caraballo engaged in forced sexual activity with Angel, and his own admissions placed him in a position where, although the evidence suggests that he did not fire the fatal shot, he witnessed the brutal murder of Angel and did not intervene. Caraballo was also present when Portobanco was stabbed repeatedly and left for dead.
Caraballo's own statements place him with the group that evening and implicate him in each crime committed. Moreover, multiple items belonging to both victims were found in the apartment where Caraballo barricaded himself upon returning to Orlandowhere law enforcement found him alone. Consequently, there is competent, substantial evidence to support each of Caraballo's convictions.

Guilt Phase Claims
Caraballo raises three claims that relate to the guilt phase of his trial. First, he contends that the entry into and search of the apartment where he was found and the seizure of evidence found therein violated his Fourth and Fourteenth Amendment rights.[7] Second, he also claims that certain statements were taken from him in violation of Miranda. Third, he claims that the prosecutor engaged in improper argument. As we explain below, none of these claims warrant relief.

Fourth Amendment Claim
Caraballo argues that his constitutional protections against unlawful search and seizure were violated when law enforcement conducted a warrantless entry into and search of the apartment where he was found on April 28. Consequently, Caraballo contends, the trial court erred when it denied his motion to suppress evidence seized from the apartment. As explained below, we agree with the trial court's conclusion that Caraballo had previously abandoned his interest in the apartment where he was found to have barricaded himself after the murder of Angel. Therefore, Caraballo did not have an expectation of privacy at the time when law enforcement officers entered and searched the apartment. In reviewing the correctness of the trial court's ruling on a motion to suppress, we presume the correctness of "the trial court's determination of historical facts." Welch v. State, 992 So.2d 206, 214 (Fla.2008) (quoting Connor v. State, 803 So.2d 598, 608 (Fla.2001)). However, we independently review "mixed questions of law and fact that ultimately determine constitutional issues." Id. (quoting Connor, 803 So.2d at 608).
A "person who claims the protection of the [Fourth] Amendment [must have] a legitimate expectation of privacy in the invaded place." Rakas v. Illinois, 439 *1245 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). "Although warrantless searches and seizures are generally prohibited by the Fourth Amendment to the United States Constitution and article I, section 12, of the Florida Constitution, police may conduct a search without a warrant if consent is given or if the individual has abandoned his or her interest in the property in question." Peterka v. State, 890 So.2d 219, 243 (Fla.2004). We have recognized that "[t]he test for abandonment is whether a defendant voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search." Branch v. State, 952 So.2d 470, 476 n. 4 (Fla.2006) (quoting State v. Lampley, 817 So.2d 989, 991 (Fla. 4th DCA 2002)). We conclude that Caraballo had no expectation of privacy in the apartment where he was found.
The evidence presented at the suppression hearing established that in December 2001, Caraballo signed a ten-month lease for an apartment at the Hawthorne Village Apartments. Because he did not pay rent for April 2002, a three-day eviction notice was posted on the apartment door on April 5. On April 10, the apartment maintenance supervisor conducted a walk-through of the apartment and determined that it had been abandoned. This information was given to the apartment manager who then instructed that a vendor's lock be placed on the door in order to allow various vendors access to the apartment for cleaning and painting. Shortly before the murder, around April 26, Caraballo returned to the apartment complex and asked for a key to the new lock so that he could reenter the apartment to pick up a washer and dryer. Caraballo told the leasing agent that he had removed all of his other belongings but needed to return to pick up those final items. Although the apartment complex had begun eviction proceedings, the court's formal judgment of eviction was not final until May 2four days after the murder.
In denying Caraballo's motion to suppress evidence seized from the apartment, the trial court's order noted several facts. Among these facts was the maintenance supervisor's observation during the April 10 walk-through that the apartment appeared abandoned. The maintenance supervisor found no food or utensils in the kitchen and no toiletries or towels in the bathroom. Moreover, there was no furniture in the apartment, and the closets were empty. The maintenance supervisor reported this information to the apartment manager who instructed that a vendor's lock be placed on the door to allow access to people who would work inside the apartment, such as painters and carpet cleaners. Moreover, the trial court noted that Caraballo had to return to the apartment office to request a key to the apartment so that he could remove a washer and dryer from it. When Caraballo requested the key, he also told the leasing agent that he had moved all of his other belongings from the apartment and was returning to pick up some final items. The trial court noted:
Although the purported eviction was not final under Florida law, the evidence is clear that Victor Caraballo conceded to the eviction and abandoned the apartment. His subsequent return to the apartment without the consent of the management was an act of trespass that did not confer upon him an expectation of privacy with respect to the apartment.
We conclude that the trial court's order denying Caraballo's motion to suppress was based on competent, substantial evidence. Under these facts, we agree that the lack of a final order of eviction did not mean that Caraballo was a lawful tenant at the time law enforcement entered the *1246 apartment on April 28. Therefore, we affirm the trial court's denial of Caraballo's motion to suppress and conclude that this claim is without merit. Moreover, because we conclude that no underlying illegality occurred when law enforcement entered into and searched the apartment, we reject Caraballo's claim that his statements to Agent Hidalgo while inside the apartment must be suppressed as "fruit of the poisonous tree."[8]
Additionally, we reject Caraballo's claim that law enforcement lacked probable cause to arrest him for trespassing. At the time that law enforcement entered the apartment, they knew that the person last associated with the apartment (Victor Caraballo) shared the same last name as Hector Caraballo, the individual to whom a call from the cell phone of one of the victims was linked. They also knew that the approved vendor's lock to that apartment had been removed from the front door and was replaced with one that the apartment complex did not have access to. Moreover, by the time they encountered Caraballo, law enforcement was aware that the person inside had ignored their knocking, announcements, and drilling, and that the person had barricaded himself inside the apartment with a piece of wood and a hydraulic jack. Additionally, law enforcement reasonably believed that the former tenant had been evicted, and any person found inside was there illegally. Once the officers entered the apartment, Caraballo identified himself as Victor Caraballo and said that Hector Caraballo, the named person of interest, was his brother. When Agent Hidalgo arrived, Caraballo volunteered that he was trespassing in the apartment. Under the totality of the circumstances, law enforcement had probable cause to arrest Caraballo for trespassing or to detain him and question him further. See Chavez v. State, 832 So.2d 730, 747-48 (Fla.2002) ("Probable cause to arrest exists when facts and circumstances within an officer's knowledge and of which he had reasonably trustworthy information are sufficient to warrant a person of reasonable caution to believe that an offense has [been] or is being committed.") (quoting McCarter v. State, 463 So.2d 546, 548-49 (Fla. 5th DCA 1985)).

Miranda Claim
Caraballo also contends that the taped interview that took place at the FDLE office on the evening of April 28 was conducted in violation of his Fifth Amendment privilege against self-incrimination. We disagree. In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court instituted certain procedural safeguards to protect a suspect's Fifth Amendment right against self-incrimination:
Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, *1247 knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.
Id. at 444-45, 86 S.Ct. 1602. In concluding that the interview with Caraballo was not conducted in violation of Miranda, we consider the following: the length of time between Caraballo's Miranda warning and the interview; comments made by the officers during the interview; and the statement made by Caraballo at the end of the interview that he was hungry and tired.
First, the length of time between Caraballo's Miranda warning and the time of the taped statement does not, without more, render his statement involuntary. See Bush v. State, 461 So.2d 936, 939 (Fla. 1984) ("Although it had been eleven hours since the full recitation of his rights, Bush stated that he was aware of his rights and desired to waive those rights. There is no requirement that an accused be continually reminded of his rights once he has intelligently waived them.").
In this case, Caraballo signed his waiver at 4:10 p.m. on April 28, and the taped interview began about 10 p.m. that evening. Caraballo was not given his Miranda warning again before the interview began because he was informed of his rights earlier. Both Agent Hidalgo and Agent Susan Koteen of FDLE also testified that Caraballo was advised of his rights in Spanish. Caraballo said that he understood each right, and he was provided a rights form in Spanish, which he signed. Both agents witnessed these events. Consequently, we conclude that Caraballo knowingly and voluntarily waived his Miranda rights, and that waiver extended to his interview at the FDLE office later that evening.
Second, we conclude that comments made by the officers during the interview, which suggested that Caraballo's cooperation with law enforcement would be disclosed to the trial court, did not vitiate the voluntariness of Caraballo's statement. In particular, Caraballo contends that the officers improperly prodded him to "tell the truth" and promised to help him in court if he provided useful information. This Court has said that "[t]he fact that a police officer agrees to make one's cooperation known to prosecuting authorities and to the court does not render a confession involuntary." Maqueira v. State, 588 So.2d 221, 223 (Fla. 1991); see also Bush, 461 So.2d at 939 ("In addition, we have previously held that a confession is not rendered inadmissible because the police tell the accused that it would be easier on him if he told the truth.").
We reject Caraballo's reliance on Ramirez v. State, 15 So.3d 852 (Fla. 1st DCA 2009). Caraballo contends that in light of Ramirez, certain comments made to him by the law enforcement officers rendered his statements involuntary. We disagree. In Ramirez, the First District Court of Appeal concluded that the trial court should have granted Ramirez's motion to suppress an interrogation video because multiple promises of help from law enforcement officers rendered his statement involuntary. Id. at 856-57. We note that the facts which established the involuntariness of the statements in Ramirez were much more excessive than those upon which Caraballo relies. We conclude that the officers' comments during the taped interview of Caraballo did not affect the voluntariness of any statements made by him.
*1248 Third, we reject Caraballo's argument that his statement was involuntary because he was hungry and tired. During the interview, Caraballo said that he had to go to the bathroom, was hungry, and was exhausted. However, Caraballo made this statement at the very end of the interview, and when he did so, the agents immediately stopped the interview. Consequently, we find no merit in this argument.
Because we conclude that the statements made during Caraballo's interview were voluntary and that the interview was conducted with Caraballo having freely waived his constitutional protection against self-incrimination, Caraballo is not entitled to relief.

Prosecutor's Closing Argument
Caraballo alleges that a number of comments made during the prosecutor's guilt phase closing argument were improper and deprived him of a fair guilt phase proceeding. Specifically, Caraballo contends that the prosecutor improperly disparaged the tactics of defense counsel, improperly bolstered the credibility of the prosecution, improperly commented on Caraballo's right to remain silent, and made misstatements of law which improperly shifted the burden of proof to the defense. As a result, he argues, the prosecutor's misconduct renders his conviction unreliable.
"Prosecutorial improprieties `must be viewed in the context of the record as a whole to determine if a new trial is warranted.'" LaMarca v. State, 785 So.2d 1209, 1214 (Fla.2001) (quoting Sireci v. State, 587 So.2d 450, 452 (Fla.1991)). "The control of prosecutorial comments is within the trial court's discretion, and this Court will not reverse the trial court's decision unless there has been an abuse of that discretion." Nowell v. State, 998 So.2d 597, 606 (Fla.2008) (citing Schoenwetter v. State, 931 So.2d 857 (Fla.2006)). After reviewing the closing argument in its entirety, as we explain below, we conclude that the prosecutor's comments do not warrant relief.
We begin by examining a comment that prompted both an objection from defense counsel and a motion for mistrial:
Prosecutor: What else comes out in cross-examination? Susan Koteen is a bad person because she only had one Spanish interpreter available.
How does that have anything to do with whether or not this guy had committed a crime? You mean, if he had confessed an hour and 45 minutes earlier that would have been different?
If he had confessed the next day, the next week, the next month would that have changed something? How does that have any meaning?
So why were all these questions asked? The questions were asked because defense counsel has to distract you.
If you keep your eye on the ball, and talking about whether or not this defendant was involved
Defense Counsel: Objection. The lawyers are not on trial, Your Honor. It is on voluntariness.
The Court: Come sidebar, please.
At this point, defense counsel moved for a mistrial and a lengthy sidebar was held at the bench. Although the court denied the motion for mistrial, it cautioned the prosecutor about the tone of the argument and his questioning the motives of the defense. The Court said:
I don't think it's [sic] rises to a level of saying smoke and screens or anything to suggestI mean, to suggest anything that would rise to the level of a mistrial.

*1249 But the reason why I did request a sidebar is because I'm concerned about the tone of the presentation with respect to defense motives for asking questions and how he's choosing to proceed and I don't know if this is going to permeate to the rest of your closing.
I'm not granting a mistrial, but are you going to continue to make an argument throughout closing about the motives for defense counsel asking questions or the motives for defense counselbecause I mean I'm being honest with youI have a problem if you are going to continue to do that.
Caraballo contends that the prosecutor's comment was improper because it disparaged the defense and questioned the motives of defense counsel. However, we conclude that the trial court properly denied the motion for mistrial.
A motion for mistrial should be granted only where necessary to ensure that the defendant receives a fair trial. See Mendoza v. State, 964 So.2d 121 (Fla. 2007). We conclude that the trial court did not abuse its discretion by denying defense counsel's motion for mistrial because this comment was not so prejudicial that it vitiated the entire trial. Following the trial court's warning to the prosecutor that he move on to another topic, the prosecutor complied by discussing the scientific evidence introduced at trial. Under these circumstances, the trial court did not abuse its discretion in denying Caraballo's motion for mistrial.
Additionally, Caraballo argues that certain comments not objected to by defense counsel were also improper: (1) a comparison of the defense's strategy to a "scam"; (2) a comment that "only lawyers and painters can change black to white"; (3) a comment on Caraballo's right to remain silent; and (4) misstatements of law concerning the burden of proof. Comments that did not receive a timely objection are not preserved for appellate review and are entitled to relief only where fundamental error has occurred. See Brooks v. State, 762 So.2d 879, 898-99 (Fla.2000). Fundamental error is that which "reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." Id. at 899 (quoting McDonald v. State, 743 So.2d 501, 505 (Fla.1999)).
Although we conclude that none of the unobjected-to comments rise to the level of fundamental error, we address Caraballo's claim that the prosecutor improperly commented on his constitutional right to remain silent. We have said that "any comment on, or which is fairly susceptible of being interpreted as referring to, a defendant's failure to testify is error and is strongly discouraged." Rodriguez v. State, 753 So.2d 29, 37 (Fla.2000) (quoting State v. Marshall, 476 So.2d 150, 153 (Fla.1985)). However, when read in context, the prosecutor did not offer an improper comment on Caraballo's right to remain silent. Rather, the prosecutor addressed Caraballo's apparent consciousness of guilt and the fact that Caraballo's version of events changed with each account that he gave of the crimes. The prosecutor argued that Caraballo spoke voluntarily and manipulated the facts to place himself in the best possible light. Given the evidence presented at trial that Caraballo provided four differing accounts of what happened, each one increasing his involvement in the crimes, we find no error in the prosecutor's comment.
Thus, after reviewing the prosecutor's guilt phase closing argument in the context of the entire record, we conclude that none of the prosecutor's comments, individually or cumulatively, warrant relief.

*1250 Penalty Phase Claims
Caraballo raises several claims relating to the penalty phase of his trial. However, we write to address only one of these claimsthat the trial court erred in allowing the rebuttal testimony of Dr. Lazaro Garcia, the mental health expert who conducted a competency evaluation of Caraballo. As we explain below, we conclude that Dr. Garcia should not have been permitted to testify as a State witness during the penalty phase, and this abuse of the court's discretion requires that Caraballo be granted a new penalty phase. First, we explain the circumstances which led to Dr. Garcia's penalty phase testimony. Second, we discuss Dr. Garcia's testimony. Third, we explain why the admission of Dr. Garcia's testimony was an abuse of discretion that cannot be shown to be harmless error.[9]

Background
Months before Caraballo's trial in April 2007, he was evaluated by two defense mental health experts. Based on the findings of these experts, in a motion filed in October 2006, the defense sought to have Caraballo declared mentally retarded. At a status hearing held that same month, the State raised and the court echoed concerns about Caraballo's competence to proceed. As a result of these concerns, the trial court appointed Dr. Lazaro Garcia to conduct a competency evaluation of Caraballo. Dr. Garcia's only role in this case was to evaluate Caraballo for competency pursuant to the court's order. Dr. Garcia ultimately concluded that Caraballo was competent to proceed.
In January 2007, Caraballo filed a motion to preclude Dr. Garcia from being used as a witness in any proceeding other than a competency hearing. At that time, the State sought to use the testimony of Dr. Garcia during Caraballo's upcoming mental retardation hearing to prove that Caraballo was not mentally retarded and was malingering. Caraballo argued that to allow Dr. Garcia's testimony for any purpose other than the determination of his competence to proceed would violate the confidentiality protection extended by Florida Rule of Criminal Procedure 3.211(e). Based on rule 3.211(e), the court granted Caraballo's motion to preclude Dr. Garcia from testifying during the mental retardation hearing.
Notwithstanding its earlier consideration of rule 3.211(e), the trial court permitted Dr. Garcia to testify as a State rebuttal witness during the penalty phase over defense objections.

Testimony of Dr. Garcia
Dr. Garcia testified that he was appointed by the court to conduct an evaluation of Caraballo. Dr. Garcia opined that at the time of the evaluation, Caraballo was being untruthful and was malingering. Dr. Garcia necessarily based his opinion on his observations of Caraballo during the competency evaluation, which was the only evaluation he performed.
Specifically, Dr. Garcia testified that Caraballo claimed to have experienced visual, auditory, tactile and olfactory hallucinations. Because the reported number of occurrences of distinct hallucinations was abnormally high, Dr. Garcia concluded that Caraballo was malingering. Dr. Garcia *1251 also testified that during the evaluation, Caraballo feigned a visual hallucination of a roach. Moreover, Dr. Garcia testified that he gave Caraballo a standardized test[10] to evaluate malingering and concluded that Caraballo was malingering because he provided too many incorrect answers. Dr. Garcia also testified about Caraballo's understanding of the criminal process, a part of the evaluation which was essential to a determination of whether Caraballo was competent to proceed. Despite being cautioned before his testimony began, Dr. Garcia also mentioned during cross-examination that the evaluation he conducted was a competency evaluation. What is more, during redirect examination, Dr. Garcia was questioned by the State in great detail about the topic of competency. The transcript of the proceedings revealed the following:
Prosecutor: Let's just go back to what you were appointed for now that we are allowed to say the magic word. You weren't appointed to find out whether or not four-and-a-half years before the defendant was sane when he committed the crime?
Dr. Garcia: That's correct.
Prosecutor: You weren't appointed to anything having to do with retardation?
Dr. Garcia: That's correct.
Prosecutor: Nobody even sent you an order saying please examine, please check, not even suggested?
Dr. Garcia: That's correct.
Prosecutor: Your purpose was limited to one thing; is that right?
Dr. Garcia: That's correct.
Prosecutor: And what was that?
Dr. Garcia: Competency.
Prosecutor: Explain to the jurors exactly what competency is?
Dr. Garcia: Competency basically is, can you, at the time, at this time, at the time of the evaluation, go to court or consult with your attorney. In other words, do you have sufficient capacity to realize what you have been charged with? Do you realize the consequences, the seriousness of the charges? Can you speak to your lawyer, and saying this is the events as they happen? Can you, if somebody says something incorrectly or erroneous about you, can you tell the lawyers that's not the way it happened, this is the way it happened. Do you have an idea of how the court system works? Do you realize it's kind of like a boxing match where you have somebody who is defending you and you have somebody who is prosecuting you?
And those are the kinds of things you look for in a competency evaluation. In other words, can you go to trial and understand what's going on?
Prosecutor: Now is competency something that can vary month-to-month and year-to-year for everybody?
Dr. Garcia: Yes.
Prosecutor: The date that you were specifically asked to examine the defendant by court order, were you trying to determine right at that time if he was competent to sit down the way he is today and assist his attorneys in the presentation of the case?
Dr. Garcia: That's correct.
Prosecutor: And what did you conclude, sir?
Dr. Garcia: That he was competent.
Prosecutor: Were you ever asked to do anything else about this big book or anything else? Was there anything else ever requested of you by any other person?
Dr. Garcia: No.

*1252 Prosecutor: By myself, defense counsel, by the judge? Anybody?
Dr. Garcia: Nobody.
Prosecutor: Were your duties completed when you returned the report to the Judge saying I found this person to be competent to proceed, go ahead?
Dr. Garcia: To the best of my knowledge my duties were complete.
Prosecutor: Thank you, sir, nothing else.
Dr. Garcia's testimony about Caraballo's competency evaluation illustrates the very harm that Florida Rule of Criminal Procedure 3.211(e) is intended to prevent.

Competency and Rule 3.211(e)
It is well-settled that a criminal prosecution may not move forward at any material stage of a criminal proceeding against a defendant who is incompetent to proceed. See Medina v. California, 505 U.S. 437, 439, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992). In order to be deemed competent to proceed, a defendant must have a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); see also § 916.12(1), Fla. Stat. (2006). This fundamental principle is grounded in the right to due process of law, a right which is afforded to criminal defendants under both the United States Constitution and the Florida Constitution. See U.S. Const. amend. XIV; art. I, § 9, Fla. Const.
This fundamental protection of due process of law is also expressly provided for in the Florida Rules of Criminal Procedure. Rule 3.210(a) provides that "[a] person accused of an offense or a violation of probation or community control who is mentally incompetent to proceed at any material stage of a criminal proceeding shall not be proceeded against while incompetent." Moreover, rule 3.210(b) provides that if the court "has reasonable ground to believe that the defendant is not mentally competent to proceed," it shall immediately schedule a hearing to determine the defendant's competency and may appoint experts to evaluate the defendant. See Scott v. State, 420 So.2d 595, 597 (Fla.1982) ("[I]t is the responsibility of the trial court to conduct a hearing for competency to stand trial whenever it reasonably appears necessary to ensure that a defendant meets the standard of competency."). Under rule 3.210(b), the order for a competency hearing may arise through the court on its own motion or through a motion by counsel for the State or the defense.
The competency evaluation itself is governed by rule 3.211, entitled "Competence to Proceed: Scope of Examination and Report." This rule sets forth the factors that court-appointed experts must consider when evaluating whether a defendant is competent to proceed, and it details the information that must be addressed in the examining expert's written report. The rule also provides procedures for the examining expert in the event that a defendant is found incompetent to proceed. These procedures have also been codified in section 916.12, Florida Statutes (2006).
As a result of the court's obligation to ensure that the material stages of a prosecution not proceed against a criminal defendant while the defendant is mentally incompetent, any defendant may be subjected to a mandatory competency evaluation and, consequently, subjected to the risk of saying something or responding in a manner that is detrimental to or incriminates the defendant. It is for this reason that the protection of confidentiality is afforded *1253 to the substance of a defendant's competency evaluation. Under rule 3.211(e), except in certain limited circumstances, the information obtained during the course of a competency evaluation must remain confidential. Adopted in 1980, rule 3.211(e) provides:
Rule 3.211. Competence to Proceed: Scope of Examination and Report
. . . .
(e) Limited Use of Competency Evidence.
(1) The information contained in any motion by the defendant for determination of competency to proceed or in any report of experts filed under this rule insofar as the report relates solely to the issues of competency to proceed and commitment, and any information elicited during a hearing on competency to proceed or commitment held pursuant to this rule, shall be used only in determining the mental competency to proceed or the commitment or other treatment of the defendant.

(2) The defendant waives this provision by using the report, or portions thereof, in any proceeding for any other purpose, in which case disclosure and use of the report, or any portion thereof, shall be governed by applicable rules of evidence and rules of criminal procedure. If a part of the report is used by the defendant, the state may request the production of any other portion of that report that, in fairness, ought to be considered.
Fla. R.Crim. P. 3.211(e) (emphasis added). Moreover, a committee note relating to rule 3.211(e) states: "This subdivision provides for the confidentiality of the information obtained by virtue of an examination of the defendant pursuant to this subdivision." Fla. R.Crim. P. 3.211(e) cmt. (1980).

The Testimony of Dr. Garcia and Harmless Error
As we consider the propriety of the trial court having allowed Caraballo's competency expert, Dr. Garcia, to offer rebuttal testimony during the penalty phase, we are mindful that "[a] trial court has wide discretion concerning the admissibility of evidence, and, in the absence of an abuse of discretion, a ruling regarding admissibility will not be disturbed." Jent v. State, 408 So.2d 1024, 1029 (Fla.1981). Given the clear confidentiality protection afforded by rule 3.211(e)(1), the trial court abused its discretion by permitting Dr. Garcia to testify.
We also conclude that the admission of Dr. Garcia's testimony was not harmless error. When examining whether an error is harmless, this Court determines "whether there is a reasonable possibility that the error affected the verdict." State v. DiGuilio, 491 So.2d 1129, 1139 (Fla.1986). "If the appellate court cannot say beyond a reasonable doubt that the error did not affect the verdict, then the error is by definition harmful." Goodwin v. State, 751 So.2d 537, 541 (Fla.1999) (quoting DiGuilio, 491 So.2d at 1139). Dr. Garcia's testimony focused heavily on whether Caraballo was a malingerer. The testimony suggested to the jury that Caraballo lied about having some or all of the types of hallucinations that he claimed, feigned a visual hallucination during the competency evaluation, and purposely gave incorrect answers on the malingering test in an effort to appear to be incompetent to proceed. There is little question that if the jury believed Dr. Garcia's testimony, it would have discounted other evidence that the defense introduced as mental health mitigation. Thus, the admission of Dr. Garcia's testimony interfered with the jury's ability to conduct a proper evaluation of "[w]hether sufficient mitigating circumstances *1254 exist[ed] which outweigh[ed] the aggravating circumstances found to exist." § 921.141(2)(b), Fla. Stat. (2006). Consequently, there is at a minimum a reasonable possibility that the admission of Dr. Garcia's testimony, which attacked the credibility of evidence offered by Caraballo as mitigation, affected the jury's determination of whether it should recommend a sentence of life imprisonment or death. Therefore, the error was harmful.
This Court has previously addressed rule 3.211(e) claims in Phillips v. State, 894 So.2d 28 (Fla.2004), and Long v. State, 610 So.2d 1268 (Fla.1992). While this Court concluded that the testimony of a competency expert was permissible in Phillips and Long, we note significant procedural and factual distinctions between the two cases and Caraballo's case and find them inapplicable here.

CONCLUSION
Because we reverse for a new penalty phase based on the violation of rule 3.211(e), we do not address the other penalty phase issues raised by Caraballo or by the State on cross-appeal. We affirm Caraballo's convictions for the first-degree murder of Angel, the attempted first-degree murder of Portobanco, both counts of kidnapping, both counts of robbery, and the sexual battery of Angel. We also affirm Caraballo's sentences for the crimes of attempted murder, kidnapping, robbery, and sexual battery. However, we vacate Caraballo's sentence of death for the murder of Angel and we remand to the trial court for further proceedings consistent with this opinion.
It is so ordered.
QUINCE, C.J., and PARIENTE, LEWIS, LABARGA, and PERRY, JJ., concur.
POLSTON, J., concurs in part and dissents in part with an opinion, in which CANADY, J., concurs.
POLSTON, J., concurring in part and dissenting in part.
I concur with the majority's decision to affirm Caraballo's convictions. However, I respectfully dissent to the majority's decision to remand for a new penalty phase. Unlike the majority, I do not believe that Dr. Garcia's penalty phase testimony constitutes reversible error.
Our precedent indicates that a trial court does not abuse its discretion in permitting an expert to testify during the penalty phase about a competency interview to rebut the defense's mental mitigation. In Phillips v. State, 894 So.2d 28, 40-41 (Fla.2004), this Court addressed a claim that appellate counsel was ineffective for failing to raise the admissibility of an expert's testimony during a second penalty phase in violation of Florida Rule of Criminal Procedure 3.211(e). This Court concluded that the expert's testimony "was proper, and appellate counsel cannot be deemed ineffective for failing to raise a meritless issue." Phillips, 894 So.2d at 41 (citing Long v. State, 610 So.2d 1268, 1275 (Fla.1992)). Like Dr. Garcia in the instant case, the expert in Phillips testified during a penalty phase about a competency interview with the defendant to rebut the defense's proposed mitigation. In fact, like Dr. Garcia, the expert in Phillips "testified to the type of questions he asked [during the competency interview, the defendant's] responses, and the psychological interpretation of those responses." Id.
The difference between Phillips and the instant case is that here (unlike in Phillips) the purpose of the mental health interview was disclosed to the jury. However, any error in mentioning competency was invited error in this case. Dr. Garcia first mentioned the purpose of his evaluation of Caraballo in response to defense *1255 counsel's questions on cross-examination as to why Dr. Garcia had not reviewed particular mental health records from around the time preceding the murders. The next two instances in which Dr. Garcia discussed competency were also in response to similar questions by defense counsel. Therefore, once defense counsel opened this door and invited any error, the State was free to address the matter on rebuttal. See Tanzi v. State, 964 So.2d 106, 115 (Fla.2007); Ellison v. State, 349 So.2d 731, 732 (Fla. 3d DCA 1977) (explaining that "Florida courts follow the `invited error' rule" and stating that "[h]aving opened the door to this line of questioning by his own direct testimony, [defendant] cannot now be heard to complain that the State marched through the door so opened").
Moreover, in Phillips, the expert testified that he had conducted a "mental status examination" of the defendant. Phillips, 894 So.2d at 41. Certainly, the term "competency" can do no more harm than the term "mental status examination." It simply appears the majority is improperly receding from this Court's decision in Phillips without acknowledging that it is doing so.
CANADY, J., concurs.
NOTES
[1] Hector Caraballo is the brother of the appellant, Victor Caraballo. Throughout this opinion, Victor Caraballo will be referred to as "Caraballo." His brother will be referred to as "Hector Caraballo."
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] During oral argument on September 2, 2009, Caraballo's counsel revealed that Caraballo granted the television interview without consulting his trial counsel.
[4] Codefendants Mena and Roman were both tried by jury and sentenced to life imprisonment. Roman was under the age of eighteen at the time of the murder. Mena's convictions and sentences were affirmed on direct appeal. See Mena v. State, 23 So.3d 123 (Fla. 3d DCA 2009). Roman's direct appeal is still pending. Codefendants Lebron and Hector Caraballo are still awaiting trial.
[5] Codefendant Roman was found guilty of all seven counts. Codefendant Mena was convicted of six of the seven counts; he was acquitted of the sexual battery of Angel.
[6] Spencer v. State, 615 So.2d 688 (Fla.1993).
[7] The Fourth Amendment to the United States Constitution protects against unlawful searches and seizures and is made applicable to the states by the Fourteenth Amendment to the United States Constitution. See Jones v. State, 648 So.2d 669, 675 (Fla. 1994).
[8] Also, because we agree with the trial court that Caraballo abandoned the apartment and had no legitimate expectation of privacy therein, we do not address the following: whether law enforcement reasonably relied on the apartment manager's apparent authority to consent to entry; whether the search exceeded the scope of a proper search incident to arrest; whether the seized evidence was covered by the plain view exception to warrant requirement; whether exigent circumstances justified the entry into and search of the apartment; and whether the search and seizure of evidence was justified by the consent form signed by Caraballo.
[9] We note that effective January 1, 2010, Florida Rule of Criminal Procedure 3.211(e) was redesignated 3.211(d) due to the deletion of another subdivision of the rule. See In re Amend. to Fla. Rules of Crim. Pro., 26 So.3d 534 (Fla.2009). However, for purposes of this opinion, we refer to the rule as 3.211(e). We stress, however, that our opinion applies with equal force to the new 3.211(d), which did not undergo any substantive amendments, and is in all substantive respects identical to former rule 3.211(e).
[10] Test of Memory Malingering (TOMM).