# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

———————————————

No. 1D2023-3176

———————————————

BRANDON PAUL JANSSEN,

Appellant,

v.

STATE OF FLORIDA,

Appellee.

———————————————

On appeal from the Circuit Court for Bay County.
Timothy A. Register, Judge.


August 27, 2025


NORDBY, J.

Brandon Paul Janssen appeals his convictions and life sentences for two counts of sexual battery upon a person between twelve and eighteen years old. Janssen challenges (1) the voluntariness of his *Miranda* waiver and confession, (2) certain prosecutor comments, (3) the admission of child-hearsay statements, and (4) the trial court refusing to sentence him as a Youthful Offender. We affirm the judgment and sentence and write only to address Janssen's *Miranda* arguments.

## I.

A jury found Janssen guilty of two counts of sexual battery against the same minor victim. On the day of his arrest, Janssen's

first contact with law enforcement was a voluntary encounter at his workplace, a gas-station, where Lieutenant Jeremy Mathis approached and asked to speak to Janssen outside. After a brief conversation about the victim, how the two knew each other, and the claims she made, Janssen began to apologize. Mathis then asked Janssen if he would take a ride to the sheriff's office with him. Janssen was allowed to clock out of work. He then rode in the passenger seat of the patrol vehicle, unhandcuffed, where Mathis read Janssen his *Miranda* warnings before arriving at the station.

Contrary to Mathis's version of what happened during the ride, Janssen asserted that Mathis did not administer the *Miranda* warnings until after they arrived at the sheriff's office. The trial court resolved this factual dispute in the State's favor—relying on Janssen and Mathis's hearing testimony and the video evidence discussed below. The trial court found Mathis credible and Janssen incredible to the extent their stories conflicted.

A video recording captured Janssen's interrogation at the sheriff's office. At the start of the video, Janssen is placed in a room; Mathis confiscates his phone, takes his driver's license, and performs one last pat-down before he leaves. Mathis returns ten minutes later. Within thirty seconds, Janssen signs a *Miranda* waiver form.

The first thing Mathis did upon entering the room was ask whether Janssen had any issues with reading and writing—to which Janssen said no, asserting that he had an associate's degree in carpentry. Mathis replied, "okay, so I want you to read this, the top part, and tell me if that is what I told you in the truck." Janssen read the page, later entered into evidence, that contained the four *Miranda* warnings, nodded, and said "yes sir." Before Janssen signed, Mathis also read the bottom portion of the form out loud—again saying, "okay so, confirming I went over [the top part] with you in the truck"—and Janssen nodded before reaffirming that he did not want a lawyer. Finally, Mathis said, "I think you'll agree with me that I haven't threatened you, haven't promised you anything, nothing like that—so if you agree with that, can you sign here?" Without hesitation, Janssen signed the document while still nodding. The waiver form was entered into evidence at trial.

Throughout the video, officers asked Janssen three more times if his *Miranda* warnings had been read to him, and each time he confirmed that they had and declined to invoke his right to speak to an attorney. Officer Dakota Merritt first confirmed that Janssen was *Mirandized* when he began interviewing Janssen. When he entered the room, Merritt asked whether Mathis went over his rights and specifically said, "you haven't requested a lawyer or anything like that?" Janssen shook his head and Merritt asked "[a]ll right, then so do you know why you're here?" When Janssen nodded, Merritt said, "All right go ahead and tell me why you're here." Janssen recounted getting drunk and said, "I did some things with [the victim] and I wasn't in the right state of mind when I did it."

Another half hour went by before Merritt again asked Janssen if he knew he could invoke *Miranda* and whether he wished to do so. Again, Janssen declined. Finally, for a third time, Janssen confirmed that he received *Miranda* warnings and was waiving his right against self-incrimination when Merritt began to take the last iteration of Janssen's confession.

Otherwise, Janssen's interrogation went about as one would expect, given the gravity of the accusations he faced. The officers measured Janssen's version of events and confessions against the information from the victim. At first, the officers ask open-ended questions and leave Janssen as much room as possible to say what he wanted to. As time went on, Janssen admits more and more details of the crime. Both officers enter and exit the room, and while they are away, Janssen lays down on the ground and begins to pray—asking God for mercy.

Eventually, the officers' asked more pointed questions. For example, when Janssen suggested that the teenage victim initiated their sexual contact, and said, "no means no, if she would have said no—" Merritt cut him off sternly:

> Let's get something straight, okay. She's [a minor] she doesn't have the ability to say yes. You're twenty. You're a grown ass man. And I'm telling you right now you're really pissing me off. You're twenty . . . how would you feel if somebody else was doing this shit to her?

3

Okay. . . . She's [a minor] she did not come onto you. This whole persona you're putting on of 'it was just a mistake' and 'she's really—she's always trying to get up on me.' Listen to what I'm telling you. . . . You've admitted to making a mistake, and I can respect that. What I can't respect is you sitting here and blaming her for what has happened. . . . And I'll tell you what's fixing to happen— if you don't start being 100 percent truthful with me, because I watched that [victim] bawl her eyes out in an interview . . . So, here's the deal, you can either start being 100 percent honest with me, and when I ask a question, you give me the answer that is truthful, or I'm fixing to bury you and put you in prison right now. So, tell me about the time you had sex with [the victim].

No doubt, Merritt's tone was frustrated—and he admitted as much at the suppression hearing, stating that the "bury you" comment could have been "scary" for someone in Janssen's shoes. Later, Mathis was similarly stern. After Janssen's initial confession, Mathis returned and shut the door hard before saying:

Hey man, it's me again. All right so we're going to discuss a couple of things, okay? Number one, first and foremost, you made the statement to Investigator Merritt that [the victim] came onto you. Let's cut that bullshit out. Okay? . . . Let's cut that bullshit out, all right. Number two: the interview that was done with her is called a forensic interview. Okay, that interview is only done to get the truth from the child. 100 percent of the truth. Now that doesn't make sense that she would [include a detail], which you admit to. It doesn't make sense that she would talk about [other details], which you admit to. It doesn't make sense that she would talk about other things happened that you have said happened that day—but then when she [describes the sexual battery], you go "oh! that didn't happen! that didn't—" kids don't just throw in things out of the blue. Okay. Here's what happened— guaranteed. You tried . . . . And you said, "well hell that's not going to work." That's why. Now you can sit in here and [deny it happened]—no [it] didn't because it didn't [work], because she's [a minor]. She hasn't started having

sex yet, she hasn't started going through that. Well, you knew that it was going to hurt her severely if you did, so you stopped. All right. Now let's cut the bullshit.

After reviewing the video footage and hearing Janssen, Mathis, and Merritt's testimonies, the trial court found that Janssen voluntarily waived his *Miranda* rights and that his confessions were admissible at trial. The court rejected Janssen's argument that the officer's conduct was unduly coercive, irreparably tainting his confession.

II.

The Florida and Federal Constitutions both protect a defendant's right against self-incrimination. Amend. V, U.S. Const.; Art. I, § 9, Fla. Const. To that end, courts have recognized "constitutionally required 'procedural safeguards'"—commonly known as the *Miranda*[*] warnings—to hedge against the State compelling a defendant to incriminate himself. *Myers v. State*, 211 So. 3d 962, 966 (Fla. 2017); *see also Vega v. Tekoh*, 597 U.S. 134, 143 (2022) (describing *Miranda* as "prophylactic rules" "needed to safeguard" defendants' Fifth Amendment rights during custodial interrogations); *Traylor v. State*, 596 So. 2d 957, 965–66 (Fla. 1992) (interpreting article I, section 9 of the Florida Constitution to require *Miranda* warnings before confession).

Of course, defendants may waive their right against self-incrimination if that waiver is "knowing, intelligent, and voluntary." *Thomas v. State*, 351 So. 3d 197, 204 (Fla. 1st DCA 2022). The State shoulders the burden of proving voluntariness by a preponderance of the evidence. *Id*. Proving voluntariness requires two showings, under the totality of the circumstances:

First, the relinquishment of the right must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being

---

[*] *Miranda v. Arizona*, 384 U.S. 436, 479 (1966).

5

abandoned and the consequences of the decision to abandon it.

*Id.* (quoting *Ramirez v. State*, 739 So. 2d 568, 575 (Fla. 1999)).

And courts have distilled several factors to help specify that two-step evaluation, four of which are relevant here. *Hall v. State*, 248 So. 3d 1227, 1230 (Fla. 1st DCA 2018). First, the officers cannot have provided the *Miranda* warnings in any way that undermines their efficacy—for example, the officers' conduct must be free of threats, cajoling, or trickery. *Id.*; *Ramirez*, 739 So. 2d at 576. Second, "the suspect's age, experience, background, and intelligence" may magnify otherwise licit police pressure rendering it unduly coercive. *Id.* Third, if the questioning took place in a police station, that implicitly adds pressure that impinges voluntariness. *Id.* And finally, where a waiver is obtained in writing, it favors a State argument that it was obtained voluntarily. *Id.* At bottom, all of these factors are oriented toward guaranteeing that police activity is not unduly coercive—which is a necessary predicate for finding that a waiver or confession was unconstitutionally procured. *Baker v. State*, 71 So. 3d 802, 814 (Fla. 2011). We "must balance any alleged infractions in context and against the noted objective of any interrogation" which is to make sure police are not overbearing while maximizing their "ability to elicit admissions in the pursuit of the public welfare, to assist victims of crimes, and to investigate" them. *Martin*, 107 So. 3d 281, 305, 313 (Fla. 2012).

To that end, we have recognized that an officer advising a suspect of potential penalties and consequences does not taint a confession, nor does encouraging their cooperation. *See Leverette v. State*, 362 So. 3d 320, 324 (Fla 1st DCA 2023) (citing *Martin*, 107 So. 3d at 305). The same goes for encouraging truthfulness. *Id.* (citing *Bush v. State*, 461 So. 2d 936, 939 (Fla. 1984)). And "[a]greeing to let the prosecutor know [a suspect] cooperated does not render a confession involuntary." *Id.* (citing *Caraballo v. State*, 39 So. 3d 1234, 1247 (Fla. 2010)).

## III.

With that backdrop, we turn to Janssen's claims. In reviewing the trial court's decision, we defer to any findings of fact supported by competent, substantial evidence. *Thomas*, 351 So. 3d at 204. But we afford such findings less deference when, as here, a finding is based on video evidence that we have equal access to. *Id.* We review legal conclusions de novo. *Id.*

We pause to note that, for the first time on appeal, Janssen argues that he was subject to custodial interrogation the moment that Mathis confronted him at work with the victim's allegations. Because the moment of custody was significantly earlier, Janssen now believes, so too should have been his *Miranda* warnings. This specific argument was not raised below, so it was waived. *Archer v. State*, 613 So. 2d 446, 448 (Fla. 1993). Further, to the extent Janssen disputed whether Mathis provided a *Miranda* warning during the ride to the sheriff's office, the trial court concluded otherwise, finding Janssen not credible on this point. This conclusion was supported by competent, substantial evidence and confirmed by the video footage.

Remaining is Janssen's argument that his post-*Miranda* confessions were a product of coercion; therefore, their admission compelled him to be a witness against himself. We disagree.

Here, certain factors are straightforward. At the time of his interrogation, Janssen was a twenty-year-old man with a sound ability to read and write—having completed an associate's degree in carpentry and manning a gas station cash register at the time of his arrest. Thus, the factor concerning his "age, experience, background, and intelligence" is of no concern. To quickly address Janssen's point, he asserts that his "dyslexia, childhood skull fracture, and history of sexual abuse by his grandfather" made him "particularly vulnerable to police coercion." There is scant evidence in the record to support this claim. In a one-thousand-plus page record, the word "dyslexic" appears once—in Janssen's own testimony. And the singular references to a childhood skull fracture and sexual abuse come from his mother's sentencing testimony. He does not explain how these traces of information diminished his ability to receive *Miranda* warnings. None of this,

7

we can say, presents a barrier to holding that he voluntarily confessed to his crimes, given established precedents. Voluntary waivers are routinely found under far more severe circumstances. *See, e.g.*, *Bevel v. State*, 983 So. 2d 505, 516 (Fla. 2008); *J.H. v. State*, 344 So. 616, 620 (Fla. 1st DCA 2022); *Brookins v. State*, 704 So. 2d 576, 578 (Fla. 1st DCA 1997).

Next, the waiver was obtained in writing at the sheriff's office. This covers two more factors. Mere presence in a jailhouse setting does not spoil a statement's voluntariness. *See, e.g.*, *J.H.*, 344 So. 3d at 620; *Hall*, 248 So. 3d at 1231. And neither does an officer's *failure* to obtain a written *Miranda* waiver. *See Sliney v. State*, 699 So. 2d 662, 669 n.10 (Fla. 1997); *Traylor v. State*, 596 So. 2d 957, 966 (Fla. 1992) ("[W]here reasonably practical, prudence suggests [a *Miranda* waiver] should be in writing."). So the fact that the first thing that Janssen did was sign the waiver, before either officer applied *any* pressure, is great evidence of voluntariness.

The only remaining question, then, is whether, despite Janssen's signing the *Miranda* waiver form and verbally declining to invoke his constitutional rights, Mathis's and Merritt's behavior was unduly coercive, thereby voiding the admissibility of Janssen's statements. We conclude that it did not.

Certainly, Janssen experienced an *interrogation*, not a friendly chat. Having a complete picture of the evidence against Janssen, the officers maintained that they wanted him to cooperate and be truthful. Merritt, for example, admitted that someone could find his "bury you in prison" remark "scary." But even then, Merritt stressed that he was pushing Janssen for the answer that was "100 percent truthful"—not the answer that was subjectively satisfying. The same is true of Mathis's stern treatment. The goal of any interrogation is to "elicit admissions in the pursuit of the public welfare," and "assist victims of crimes," without infringing on a suspect's constitutional rights. *Martin*, 107 So. 3d at 305, 313. On the record before us, the officers' isolated use of stern tones and hardened language did not render Janssen's waiver involuntary, unknowing, or unintelligent.

8

IV.

Because the trial court did not err in admitting his confessions, we AFFIRM Janssen's judgment and sentence.

ROBERTS and BILBREY, JJ., concur.

———————————————

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

———————————————

Adam Lloyd Pollack, of the Law Office of Adam L. Pollack, P.A., Orlando, for Appellant.

James Uthmeier, Attorney General, and Steven E. Woods, Assistant Attorney General, Tallahassee, for Appellee.