610 So.2d 1268 (1992)
Robert Joe LONG, Appellant,
v.
STATE of Florida, Appellee.
No. 74512.
Supreme Court of Florida.
October 15, 1992.
Rehearing Denied January 26, 1993.
James Marion Moorman, Public Defender and A. Anne Owens, Asst. Public Defender, Tenth Judicial Circuit, Bartow, for appellant.
Robert A. Butterworth, Atty. Gen. and Robert J. Landry, Asst. Atty. Gen., Tampa, for appellee.
PER CURIAM.
Robert Joe Long appeals his sentence of death imposed after a new penalty phase proceeding. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons expressed, we affirm his sentence of death imposed in accordance with the jury's unanimous recommendation and reaffirm the validity of Long's guilty pleas.
At the outset, we note that the defense does not dispute that Long murdered the victim in this case, Michelle Denise Simms. The defense argued that Long is severely mentally ill and has been diagnosed as having *1269 a bipolar brain disorder and temporal lobe epilepsy, which purportedly resulted from brain damage caused by a series of head injuries. According to the defense, these illnesses caused a condition described by one of Long's mental health experts as "sexual sadism." Because of Long's mental condition, the defense sought a life sentence in the penalty phase proceeding of this case. The jury was not persuaded and returned a unanimous verdict recommending the death sentence. The trial judge agreed and sentenced Long to death for first-degree murder.
Long now challenges his death sentence. To properly address the issues Long has raised, it is necessary to set forth a chronology of events given the number of crimes and homicides for which he has been convicted. In addition to the murder in this case, Long has confessed to seven other murders in Hillsborough County and has been convicted and sentenced to death for a murder in Pasco County. See Long v. State, 610 So.2d 1276 (Fla. 1992). He has also been convicted of sexual battery in several other cases in which the victims were not murdered.

Chronology of Events
On November 28, 1984, a Hillsborough County grand jury indicted Long for the kidnapping, sexual battery, and first-degree murder of Simms. This murder occurred on May 27, 1984.
On April 27, 1985, Long was convicted of the kidnapping and first-degree murder of another victim, Virginia Johnson, in Pasco County, for which he was sentenced to death on May 10, 1985. Johnson's body had been discovered on November 6, 1984.
On September 23, 1985, Long entered into a plea agreement in which he pleaded guilty to all offenses charged against him in Hillsborough County. Those offenses included at least eight counts of first-degree murder, nine counts of kidnapping, eight counts of sexual battery, and one probation violation. In accordance with the plea agreement, Long agreed not to contest the admissibility of his confession or of physical evidence found in his car and apartment. In return, the State agreed to life sentences for all of the murders for which he was charged except that of the victim in this case. It was agreed that the State could seek the death penalty for this murder. Additionally, the agreement prohibited the State from using the other Hillsborough murder convictions that resulted from the plea agreement as aggravating factors for the murder in this case. However, it was agreed that convictions entered against Long before he executed the plea agreement could be used against him in aggravation.
On December 11, 1985, Long sought to withdraw the plea, but, on December 12, 1985, he changed his mind and elected not to withdraw his plea. The trial judge subsequently made extensive inquiries of Long in open court before finally accepting the plea agreement. The original penalty phase of this case was then held and the death penalty was imposed. The Pasco County conviction was presented to the jury in the first trial of this case as an aggravation factor, but this court later reversed the Pasco County conviction for reasons we need not address here.[1]
On his first appeal in this case, Long challenged the validity of his guilty plea. We fully addressed that challenge in Long v. State, 529 So.2d 286 (Fla. 1988), and found that Long's guilty plea was valid. However, we found it necessary to vacate Long's death sentence because we determined that the State's introduction of Long's Pasco County murder conviction in the penalty phase of that proceeding was harmful error. We explained that our subsequent reversal of the Pasco County murder conviction eliminated the proper use of that conviction as an aggravating factor.
Upon remand of this case, and before the new penalty phase proceeding, Long again challenged his guilty plea in a pro se motion before the trial court. He asserted *1270 that the consequences of the plea had not been fully explained to him. At the motion hearing, Long testified and set forth his claims before the trial judge. The trial judge denied the motion but granted a change of venue for the new penalty phase proceeding.

Evidence Presented in the Penalty Phase Proceeding
At the new penalty phase proceeding, the investigating officer in this case testified that, on May 27, 1984, Simms' nude body was found in a wooded area along Park Road just north of Interstate 4 near Plant City, Florida; that rope was tied around her front and back and around both of her wrists to restrict movement of her hands; that her throat was cut; and that clothes were scattered around the area. He additionally noted that blood was found on her head and face and that rope burns were present across her neck and chin. Evidence from the medical examiner reflected three possible causes of death: (1) strangulation, (2) head injuries, and (3) bleeding from two knife slashes in her neck.
Evidence of Long's November 16, 1984, confession, in which he gave the following account of Simms' murder, was presented to the jury. On the evening before her murder Long purchased some rope, cut it into sections, and put it in the glove compartment of his car. He put a weapon in his car and drove along Kennedy Boulevard in Tampa looking for a prostitute. When he pulled up next to the victim, she asked if he wanted a date, and when he asked how much, she said, "Fifty dollars." He agreed, she entered the car, and they drove for a distance of a half-mile to a mile. Long then pulled a knife, made the victim undress, reclined the passenger's seat into a prone position, and, at knife point, tied her up. Long further stated that he then drove fifteen to twenty miles to eastern Hillsborough County where he raped the victim. Afterwards, he talked to her, intending to take her back to where he had picked her up, and he told her he would do so. He stated that, instead, he drove to the Plant City area and tried to strangle her. After the strangulation attempt failed to render the victim unconscious, he hit her on the head with a club, and threw her out of the car. He then cut her throat and left her alongside the road. He stated that he also threw her clothes out of the car.
The State also presented, as aggravating factors, testimony regarding Long's convictions for two other crimes of violence in which the victims survived. It is important to note that both of these convictions occurred before Long entered into his September 1985 plea agreement in the Hillsborough County murders. The dialogue of the plea agreement clearly establishes that any prior convictions not the result of the plea agreement would be admissible against Long in the penalty phase proceeding. The first crime of violence occurred in Pasco County on March 6, 1984, a little more than two and one-half months before the murder in this case. The circumstances presented to the jury reflected that Long saw a house with a "For Sale" sign in front of it. He went up to the house and knocked on the door. A woman answered and Long asked the woman if he could look at the house. As soon as he gained entry, he placed his arm around the victim's neck, put a gun to her temple, and walked her into the bedroom. Long then tied her hands behind her back, taped her mouth shut with rope and tape from his pocket, and raped her. Subsequently, he gathered up some jewelry, which he later pawned in Tampa, and left the house. Long was convicted of kidnapping, robbery, and sexual battery for this crime on April 17, 1985. This conviction was rendered approximately five months before Long entered his guilty plea in the Hillsborough County murders.
The second conviction was also for kidnapping, sexual battery, and robbery. This crime occurred on May 29, 1984, approximately two and one-half days after the murder at issue here. In this instance, the victim stated that she received a telephone call concerning her newspaper advertisement to sell furniture. The man told her that he was a salesman for IBM, and she gave him directions to her home in Palm Harbor. A short time later, Long, wearing *1271 a three-piece suit, arrived at her house. The victim led Long to the bedroom to show him the furniture. At that point, Long pushed her to the floor, sat on her, and tied her hands behind her. He then blindfolded and gagged her, cut her clothes off, and raped her. Long pleaded guilty to this offense on July 12, 1985, two months before his guilty plea in the Hillsborough County murders.
Long's mother, his former wife, and other members of his family testified on his behalf concerning his upbringing. This testimony reflected that Long was born when his mother was seventeen, and that, when Long was eight months old, his mother left his father. Other evidence reflected that he slept with his mother off and on until he was approximately twelve years of age and that he disapproved of his mother's occupation and dress. His mother worked as a carhop and barmaid and wore hot pants, boots, and sexy outfits. At one point she was married to a man who became a father figure to Long and who taught him the electrical trade. However, his mother later determined that the man was already married and, consequently, had the marriage annulled. According to his mother, Long thought a lot of this man, and the annulment hurt him. Long quit school at age fifteen. Later, when Long was sixteen or seventeen, his mother began living with another man, whom Long despised.
Testimony was also presented that Long had suffered the following head injuries: he had fallen out of a swing and was knocked unconscious for a few minutes; he had fallen down a flight of stairs and had been knocked out for fifteen to twenty minutes; he had been hit by a car at age seven and had his face torn up (this resulted in his being hospitalized for a week or more); he had been thrown from a horse and knocked unconscious; and, finally, at age twenty and while in the army, he had been in a serious motorcycle accident in which he had been thrown over a car and had suffered serious head injuries.
Long's former wife testified that they were married for more than six years and had two children. She testified that after Long's motorcycle accident he was a different person. She stated that he would explode about little things or nothing at all. Additionally, she indicated that his sexual appetite increased and that he often wanted to have sex three or four times a day. Moreover, she stated that his moods varied, that he experienced temper tantrums in which he sometimes became violent, and that he took amphetamines for nine months to a year after the accident.
Two mental health professionals testified on behalf of Long. The first was Dr. John Money, a professor of medical psychology and pediatrics at John Hopkins University School of Medicine. He testified that Long had the disease of "sexual sadism," a brain disorder that, according to Dr. Money, caused Long's criminal behavior. Dr. Money also diagnosed Long as having temporal lobe epilepsy. He indicated that this was a peculiar kind of epilepsy because it does not cause seizures; instead, it causes one to enter an altered state of consciousness. Dr. Money stated that temporal lobe epilepsy often occurs with paraphilia of sexual sadism. He explained that an overlapping syndrome is a manic depressive disorder in which a person experiences alternating periods of extreme high or mania and melancholy or despair. It was his opinion that a head injury could be one hundred percent responsible for sexual sadism. Dr. Money also stated that the change in Long's sexual behavior from normal to hypersexual following his motorcycle accident and related head injuries was characteristic of sexual sadism and could result from damage to certain areas of the brain. He stated that Long's description of his feelings during the two rapes for which he had been convicted and during the murder at issue indicated that he was in an altered state of consciousness brought on by the temporal lobe epilepsy. Dr. Money explained that sexual sadists become sexually aroused by inflicting pain, but that such an individual is also capable of having sex in a normal fashion. Dr. Money expressed the view that, although Long knew what he was doing when he killed Simms, he had no control over his actions and that, in his *1272 opinion, Long lacked the capacity to appreciate the criminality of his conduct. He also expressed the view that Long's ability to conform his conduct to the requirements of law was substantially impaired when he killed Simms.
The second mental health expert who testified on Long's behalf was Dr. Robert Berland, a forensic psychologist. Dr. Berland interviewed Long on several occasions and subjected him to psychological testing. He determined that Long was above average in intelligence, with an IQ of 118. He diagnosed Long as having four kinds of disorders, two of which were nonpsychotic  paraphilia and antisocial personality disorder  and two of which were psychotic. The two psychotic disturbances consisted of an inherited bipolar or manic depressive psychosis and an organic personality syndrome caused by damage to brain tissue. He believed that the second psychosis may have been caused by Long's motorcycle accident or his chronic amphetamine abuse following the accident. He explained that, when brain damage is added to an inherited bipolar disorder, the psychosis is worsened. Dr. Berland concluded that, in his opinion, the evidence suggested there was no substantial impairment of Long's ability to appreciate the criminality of his act in murdering the victim in this case, but he found that Long was substantially impaired in his ability to conform his behavior to the requirements of law because of his mental condition. In Dr. Berland's view, Long was under the influence of extreme mental or emotional disturbance when he killed the victim and Dr. Berland believed that Long killed her in a fit of rage.
The State, in rebuttal, presented the testimony of Dr. Daniel J. Sprehe. Dr. Sprehe had been appointed by the court to evaluate Long because his counsel filed a notice of intent to rely on the insanity defense. Dr. Sprehe was directed to determine Long's competency to stand trial and competency at the time of the offense. He based his conclusions on several face-to-face interviews with Long in 1985 as well as a review of relevant records, police reports, and Dr. Berland's and Dr. Money's findings. Dr. Sprehe stated that Long told him he had with him a rope, a piece of wood, and a knife when he killed the victim, and that he would not have killed her had a policeman been standing there. He further stated that Long told him he killed the victim to "eliminate a witness" and that Long was not sure whether he hit her with the board to kill her or so she would not suffer. Although Dr. Sprehe stated that Long did suffer from a severe antisocial personality disorder, it was his opinion that Long did not suffer from a mental illness or disease. Additionally, Dr. Sprehe believed that Long's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not substantially impaired.

The Sentence
After hearing the evidence and closing arguments, the jury returned a unanimous verdict recommending the death sentence. The trial judge sentenced Long to concurrent life sentences for the sexual battery and kidnapping counts and imposed the death sentence for the first-degree murder. In doing so, the trial judge found the following aggravating factors: (1) that the crime was committed while Long was engaged in the commission of a kidnapping; (2) that the crime was especially heinous, atrocious, or cruel; (3) that Long was previously convicted of a felony involving the use or threat of violence; and (4) that the crime was committed in a cold, calculated, and premeditated manner. In mitigation, the trial judge found: (1) that Long's capacity to appreciate the criminality of his conduct or conform his actions to the law was substantially impaired, and (2) that the capital felony was committed while Long was under the influence of extreme mental or emotional disturbance. Finding that the aggravating circumstances outweighed the mitigating circumstances, the trial judge imposed the death penalty. In doing so, he fully articulated the reasons justifying the sentence, stating:
The Court finds and concludes after a proper consideration of the mitigating circumstances that the aggravating circumstances *1273 outweigh the mitigating circumstances.
While it is true that the Defendant established a history of mental and emotional problems brought on by a deprived childhood, organic brain damage and use of drugs, it is this Court's opinion that such problems, in the context of this case, did not give this Defendant, who has a propensity of violence to women as evidenced by his actions in this case and in the cases involving [the two Pasco County convictions], a license to deliberately stalk and abduct a woman he believed to be a prostitute for the purpose of committing sexual battery on her and later murdering her in an especially heinous, atrocious and cruel manner.
Moreover, the evidence is clear that had the Defendant encountered a police officer prior to the murder of his victim, he would not have committed this crime. This evidence, coupled with the deliberate steps the Defendant took to accomplish his nefarious scheme of seeking out, abducting, sexually battering and then killing a woman he believed to be a prostitute serves to lessen the mollifying impact of the mitigating circumstances found by this Court to exist when balanced against the aggravating circumstances found by this Court to exist.
In sum, the two statutory mitigating circumstances found to exist, when balanced against the statutory aggravating circumstances found to exist, do not sufficiently demonstrate that the Defendant lacked the cognitive volitional and moral capacity to act with the degree of culpability associated with the imposition of a sentence of death. That is, even taking into careful consideration the Defendant's personal and family background and relationships and his emotional and mental health problems, the Court concludes that these two statutory mitigating circumstances did not lessen his culpability when weighed against the statutory aggravating circumstances.
Although this Court is very mindful that it must exercise its independent judgment and discretion in the sentencing process in this case, the Court is in complete agreement with the unanimous recommendation of the jury that this Defendant suffer the ultimate penalty as provided by law.
In that regard it must be emphasized that the jury's recommendation was in no way contaminated by evidence that the Defendant confessed to and pled guilty to the multiple murders of the other young women as prohibited by the plea agreement.
... .
This Court is convinced beyond all reasonable doubt that this unanimous recommendation of death was based only on the evidence presented at the sentencing proceeding. Therefore, this Court is convinced that based on its own independent review of only the evidence presented at the sentencing proceeding and the additional matters presented by the parties following the sentencing proceeding that death is the only appropriate sentence and that the recommendation of the jury should not be disturbed in that after a careful consideration of all of the relevant aggravating circumstances and mitigating circumstances there is no strong reason to believe that reasonable persons could not agree with this recommendation of death.
Simply put, it is this Court's independent judgment based on all relevant data that the jury's recommendation of death is reasonable and that the facts compel a sentence of death in that the facts are so clear and convincing virtually no reasonable person could differ with the imposition of the death sentence in this case.

The Issues
Long claims that the trial court erred in: (1) denying Long's motion to withdraw his guilty pleas; (2) allowing the hearsay testimony of two detectives regarding the details of the two other rapes as crimes of violence in aggravation; (3) allowing Dr. Sprehe's testimony during rebuttal because he was appointed to determine competence and sanity rather than determining aggravation and mitigation; (4) denying defense counsel's motion to exclude Dr. Sprehe's *1274 rebuttal testimony regarding Long's alleged statement that he killed the victim in this case to "eliminate a witness"; (5) permitting Dr. Berland to testify that Long knew right from wrong; (6) denying Long's motion to prohibit television cameras without an adequate hearing; (7) denying Long's motion to preclude mention during voir dire that the jury verdict was advisory, failing to give a jury instruction that the jury verdict is binding in some circumstances, and denying Long's motion for a mistrial; (8) allowing the State to make closing arguments that were not based on the evidence in the case and by urging the jury to consider factors outside the scope of jury deliberations; (9) considering transcripts of expert witness testimony because the transcripts contained references to other murders committed by Long; (10) finding that the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification; (11) failing to consider and find nonstatutory mitigating factors which were reasonably established and were not rebutted; (12) sentencing Long to death because it is unconstitutional to execute the mentally ill; and (13) sentencing Long to death because the trial court found both mental mitigating factors and should have found nonstatutory mitigating factors, all of which outweigh the aggravating factors. We have examined each of these assertions and find that only four merit discussion.
In his first claim, Long asserts that he should be entitled to withdraw his guilty pleas. He claims he was not told that his confessions and pleas could be used against him in his Pasco County case as Williams rule[2] evidence to convict him and as aggravation in the penalty phase of that case. He also contends that his attorney led him to believe that the other Hillsborough County homicides could not be used against him in any court.
We fully articulated why Long's plea agreement was valid in our decision in Long v. State, 529 So.2d 286 (Fla. 1988), and we reiterate here our conclusion that Long's guilty plea was valid. The record clearly reflects Long's understanding that the convictions occurring before the time he entered into the plea agreement could be used against him in aggravation. Long is an intelligent defendant, and he entered the plea agreement with full knowledge of his prior convictions. His decision to plead was based on a reasonable defense theory to avoid the imposition of the death penalty in the other murders and to escape the death penalty in this case by establishing that he was a severely mentally ill individual.
Long's claim that he was not told that his confessions and pleas could be used against him in his Pasco County case as Williams rule evidence and as aggravation in the penalty phase if that case was retried is moot. In our decision in Long v. State, 610 So.2d 1276 (Fla. 1992), issued contemporaneously with this opinion, we reversed Long's Pasco County conviction, in part on the ground that his Hillsborough County pleas and confessions were improperly introduced into evidence in that case. Additionally, we held that, upon remand, Long's pleas and confessions could not be used against him in aggravation during a new penalty phase proceeding. We therefore deny this claim.
In his second claim, Long alleges it was error to allow the State to present evidence in the penalty proceeding regarding his two prior rape convictions. Although the record reflects that Long's counsel stipulated and agreed that Long had been convicted of those offenses, Long asserts that the hearsay testimony of the investigating officers in those cases should not have been allowed. We disagree. In sentencing proceedings, "evidence may be presented as to any matter that the court deems relevant to the nature of the crime and the character of the defendant." § 921.141(1), Fla. Stat. (1985). This is true even if the evidence would not be admissible under the exclusionary rules of evidence so long as the defendant has been *1275 provided a fair opportunity to rebut any hearsay statements. See Chandler v. State, 534 So.2d 701 (Fla. 1988) (holding section 921.141(1) to be constitutional), cert. denied, 490 U.S. 1075, 109 S.Ct. 2089, 104 L.Ed.2d 652 (1989). Here, when a question was raised about these convictions during the penalty proceeding, the court asked Long's counsel whether the police report contained correct information. He answered the court's inquiry by stating that the reports were "complete and correct." Additionally, he indicated that he could offer no rebuttal to the evidence the State wanted to present regarding these convictions. Given the state of this record, we find no merit in Long's claim on this point.
Long additionally asserts that it was error for the judge to allow Dr. Daniel Sprehe to testify for the State in rebuttal to the two mental health experts presented by Long in this proceeding given the confidentiality requirement in rule 3.211(e), Florida Rules of Criminal Procedure. Two points are important on this issue. First, Dr. Sprehe was initially appointed because Long's counsel filed a notice of intent to rely on insanity. Thus, Dr. Sprehe was appointed to determine both Long's competency to stand trial under rule 3.211 and his sanity at the time of the offense. Dr. Sprehe's psychiatric examination of Long occurred only after Long had placed his sanity in issue and after notice to his counsel. Additionally, the trial court's order appointing Dr. Sprehe specifically stated that Dr. Sprehe was to determine whether Long was sane at the time of the offense. Second, and as important, Dr. Sprehe was only allowed to testify in rebuttal to direct mental health testimony presented by Long. Given these circumstances, we find that Dr. Sprehe's testimony was proper. See Preston v. State, 528 So.2d 896 (Fla. 1988) (psychiatrist's testimony regarding court-ordered psychiatric examination was permissible because examination took place only after defendant placed his sanity in issue and after notice to his counsel), cert. denied, 489 U.S. 1072, 109 S.Ct. 1356, 103 L.Ed.2d 824 (1989); and Hargrave v. State, 427 So.2d 713 (Fla. 1983) (defendant who initiates psychiatric examination and introduces psychiatric evidence is precluded from objecting to State's use of psychiatrist regarding statutory mitigating circumstances). See also Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).
Finally, Long contends that it was error for the trial court to allow Sprehe to testify that Long told him he killed the victim in this case "to eliminate a witness." In Parkin v. State, 238 So.2d 817, 820 (Fla. 1970), cert. denied, 401 U.S. 974, 91 S.Ct. 1189, 28 L.Ed.2d 322 (1971), we did state that "[t]he court should prohibit [a] psychiatrist from testifying directly as to the facts surrounding the crime, where such facts have been elicited from the defendant during the course of a compulsory mental examination." However, in this case, no objection was made to Dr. Sphere's statement at the time it was uttered. The objection and motion for mistrial were not made until the jury instruction conference when the parties were discussing the applicable aggravating circumstance instructions. We conclude Long's claim fails for lack of a timely objection. Even if a timely objection had been made, we find that the admission of that particular testimony was harmless error. The trial judge and counsel agreed that the witness elimination aggravating factor had not been established, and the judge did not instruct the jury on the aggravating factor of witness elimination. Additionally, the State did not argue this as an aggravating factor to the jury in its closing argument, and it was not used by the trial court in imposing the death penalty in this case. Any error was harmless beyond a reasonable doubt.
As stated, Long's remaining claims are without merit and do not require discussion. Accordingly, we affirm Long's sentence of death in this case.
It is so ordered.
BARKETT, C.J., and OVERTON, McDONALD, SHAW, GRIMES, KOGAN and HARDING, JJ., concur.
NOTES
[1] See Long v. State, 517 So.2d 664 (Fla. 1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1754, 100 L.Ed.2d 216 (1988).
[2] Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959).