# Supreme Court of Florida

_____

No. SC19-726
_____

**ROBERT JOE LONG,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

May 17, 2019

PER CURIAM.

Robert Joe Long a/k/a Bobby Joe Long, a prisoner under sentence of death and an active death warrant, appeals the postconviction court's order denying his third successive motion for postconviction relief filed under Florida Rule of Criminal Procedure 3.851. We have jurisdiction, *see* art. V, § 3(b)(1), Fla. Const., and affirm for the reasons below.

## BACKGROUND

Long pleaded guilty to the 1984 first-degree murder, kidnapping, and sexual battery of Michelle Simms and was thereafter sentenced to death for Simms's murder in accordance with his jury's unanimous recommendation. *See Long v.*

*State*, 529 So. 2d 286 (Fla. 1988); *Long v. State*, 610 So. 2d 1268 (Fla. 1992).[1]

Long's sentence of death for Simms's murder has been final since 1993. *See Long v. Florida*, 510 U.S. 832 (1993). In the decades since, Long has unsuccessfully challenged his convictions and death sentence numerous times. *See Long v. State*, 118 So. 3d 798 (Fla. 2013) (affirming denial of initial rule 3.851 motion); *Long v. State*, 183 So. 3d 342 (Fla. 2016) (affirming denial of first successive rule 3.851 motion); *Long v. State*, 235 So. 3d 293 (Fla. 2018) (affirming denial of second successive rule 3.851 motion).[2]

Long filed his current challenge to his death sentence—his third successive under rule 3.851—after the governor signed his death warrant on April 23, 2019. After holding an evidentiary hearing on Long's as-applied challenge to Florida's lethal injection protocol, the postconviction court denied his motion. This appeal followed.

---

1. Long's death warrant carries out the sentence imposed for Simms's first-degree murder. However, as this Court has explained, Long is a serial killer who—at the same time he pleaded guilty to his crimes against Simms—pleaded guilty in seven other cases to first-degree murder, plus other crimes against those victims, and to the kidnapping and sexual battery of an eighth victim who was not murdered. *See Long*, 529 So. 2d at 288 ("Long received life sentences on every count of each [of these other] case[s] and a five-year sentence on [a] probation revocation charge.").

2. Long's federal petition for a writ of habeas corpus was also denied, and the Eleventh Circuit Court of Appeals denied a certificate of appealability. *Long v. Sec'y, Fla. Dep't of Corr.*, No. 16-16259-P (11th Cir. Jan. 4, 2017) (unpublished).

## ANALYSIS

In this appeal, Long argues that the postconviction court erred (1) in summarily denying his claim that scientific advances in the assessment, quantification, and consequences of brain injury and brain damage since his 1989 sentencing constitute newly discovered evidence requiring a new sentencing proceeding; (2) in denying his as-applied challenge to Florida's lethal injection protocol and in summarily denying his challenges to Florida's use of a three-drug protocol and use of etomidate; (3) in summarily denying his claim that adding execution to the length of time he has spent on death row violates the Eighth and Fourteenth Amendments and binding norms of international law; (4) in denying him *Hurst*[3] relief; (5) in refusing to order the Florida Department of Corrections (DOC) to comply with his requests related to defense execution witnesses; (6) in denying his claim that the Eighth Amendment categorically exempts him from execution because he suffers from severe traumatic brain injury and severe mental illness; and (7) in denying certain of his post-warrant public records requests. None of these claims warrants relief.

---

3. *Hurst v. Florida*, 136 S. Ct. 616 (2016); *Hurst v. State* (*Hurst*), 202 So. 3d 40 (Fla. 2016), *cert. denied*, 137 S. Ct. 2161 (2017).

## (1) Newly Discovered Evidence

Long first argues that scientific advances in the assessment, quantification, and consequences of brain injury and brain damage since his 1989 sentencing constitute newly discovered evidence entitling him to a new penalty phase and that the postconviction court erred in failing to grant an evidentiary hearing on this claim. We disagree.

We have explained the standard of review applicable to the summary denial of a postconviction motion as follows:

> A postconviction motion may be summarily denied only "[i]f the motion, files, and records in the case conclusively show that the movant is entitled to no relief." Fla. R. Crim. P. 3.851(f)(5)(B), (h)(6); *see also Parker v. State*, 904 So. 2d 370, 376 (Fla. 2005) ("As a general proposition, a defendant is entitled to an evidentiary hearing on any well-pled allegations in a motion for postconviction relief unless (1) the motion, files, and records in the case conclusively show that the prisoner is entitled to no relief, or (2) the motion or a particular claim is legally insufficient."). "Because a postconviction court's decision whether to grant an evidentiary hearing on a rule 3.851 motion is ultimately based on written materials before the court, its ruling is tantamount to a pure question of law, subject to de novo review." *Marek v. State*, 8 So. 3d 1123, 1127 (Fla. 2009). In reviewing a trial court's summary denial, "this Court must accept the defendant's allegations as true to the extent that they are not conclusively refuted by the record." *Tompkins v. State*, 994 So. 2d 1072, 1081 (Fla. 2008). However, mere conclusory allegations do not warrant an evidentiary hearing. *Anderson v. State*, 220 So. 3d 1133, 1142 (Fla. 2017); *see also LeCroy v. Dugger*, 727 So. 2d 236, 238 (Fla. 1998) ("[S]peculation and conjecture about what . . . letters and notes and opinions and cryptic references *may* suggest is not sufficient to warrant an evidentiary hearing, much less relief.") (quoting trial court's order).

*Jimenez v. State*, 265 So. 3d 462, 480-81 (Fla.), *cert. denied*, 139 S. Ct. 659

(2018).[4]

To establish that he is entitled to a new penalty phase based on newly

discovered evidence, Long must make the two-prong showing required by *Jones v.*

*State*, 709 So. 2d 512 (Fla. 1998), namely:

> First, in order to be considered newly discovered, the evidence "must
> have been unknown by the trial court, by the party, or by counsel at
> the time of trial, and it must appear that defendant or his counsel could
> not have known [of it] by the use of diligence." Second, the newly
> discovered evidence must be of such nature that it would probably
> produce an acquittal on retrial.

*Id.* at 521 (citation omitted) (quoting *Torres-Arboleda v. Dugger*, 636 So. 2d 1321,

1324-25 (Fla. 1994)). Because Long is seeking to vacate his death sentence, not

his conviction, *Jones*'s second prong "requires that the newly discovered evidence

would probably yield a less severe sentence." *Walton v. State*, 246 So. 3d 246, 249

(Fla. 2018) (quoting *Swafford v. State*, 125 So. 3d 760, 767 (Fla. 2013)).

The record conclusively shows that Long cannot satisfy either prong of the

*Jones* test. First, the evidence is not newly discovered. Rather, as the

postconviction court found, "[Long] has waited more than 30 years and until after

the issuance of his death warrant to first raise this claim," even though he "has

---

4. This standard governs our review of the postconviction court's denial of every claim at issue in this appeal, except claim 2(A), which the court denied after an evidentiary hearing, and claim 7 regarding Long's challenge to the court's rulings on his public records requests.

clearly been aware of his TBI [traumatic brain injury] and temporal lobe epilepsy diagnoses since the [1989] penalty phase" and has filed an initial and two successive postconviction motions since then. *See Long*, 610 So. 2d at 1271-72 (summarizing the mental health evidence presented during Long's penalty phase). Although the field of neuroscience is constantly evolving, and although Long relied on two tests that became available within the last year—NeuroQuant imaging and a new test for chronic traumatic encephalopathy (CTE)—to support his request for an evidentiary hearing, the attachments to his motion reference research and studies much older than one year prior to the date that Long filed his motion, and none of them state that the NeuroQuant imaging or new CTE test are the advances critical to Long's claim. Accordingly, the record in this case conclusively shows that, with the exercise of due diligence, Long could have pursued this claim years before his death warrant was signed. *Cf. Branch v. State*, 236 So. 3d 981, 986 (Fla. 2018) (explaining that "scientific research with respect to brain development does not qualify as newly discovered evidence" if based on previously available data); *Morton v. State*, 995 So. 2d 233, 245-46 (Fla. 2008) ("Although this 2004 brain mapping study had not yet been published at the time of [the defendant's] trials, [the defendant] or his counsel could have discovered similar research at that time that stated that the human brain was not fully developed until early adulthood."); *Schwab v. State*, 969 So. 2d 318, 325-26 (Fla.

2007) (stating that "this Court has not recognized 'new opinions' or 'new research studies' as newly discovered evidence" in holding that "recent scientific articles regarding brain anatomy and sexual offense" were not newly discovered evidence).

However, even if Long could meet the first prong of *Jones*, he could not meet the second. As the postconviction court found, Long "already presented testimony and evidence regarding [his] TBI and temporal lobe epilepsy at his [1989] penalty phase," and Long's "jury still unanimously recommended that the death penalty be imposed." In light of this testimony, the sentencing court found that Long had established the two statutory mental health mitigators. *Long*, 610 So. 2d at 1272 (finding, as mitigating circumstances, "(1) that Long's capacity to appreciate the criminality of his conduct or conform his actions to the law was substantially impaired, and (2) that the capital felony was committed while Long was under the influence of extreme mental or emotional disturbance"). However, the sentencing court relied on evidence of the "deliberate steps [Long] took to accomplish his nefarious scheme of seeking out, abducting, sexually battering and then killing [the victim],"—plus evidence that Long told the State's mental health expert that he "would not have committed this crime" had he "encountered a police officer prior to the murder of [the] victim"—to conclude that Long did not "lack[] the cognitive volitional and moral capacity to act with the degree of culpability associated with the imposition of a sentence of death." *Id.* at 1273. None of the

scientific advances at issue establishes that traumatic brain injury or temporal lobe epilepsy is the sole cause of offenses such as those that Long committed against the victim in this case; nor do they negate the sentencing court's finding that the evidence is inconsistent with Long's claim that he could not control his behavior. In light of the evidence that would be available in any resentencing proceeding, including evidence establishing some of the weightiest aggravators in Florida's capital sentencing scheme,[5] the alleged newly discovered evidence is not of such a nature that it would probably yield a less severe sentence in a new penalty phase.

Accordingly, we affirm the postconviction court's summary denial of this claim.

## (2) Lethal Injection Protocol

### (A) As-Applied Challenge

In the first of his three challenges to Florida's lethal injection protocol, Long argues that his traumatic brain injury and temporal lobe epilepsy render the use of etomidate in his execution unconstitutional under the Eighth Amendment. The postconviction court held an evidentiary hearing on this claim; therefore, "[a]s long

---

5. The sentencing court found the following aggravating circumstances: "(1) that the crime was committed while Long was engaged in the commission of a kidnapping; (2) that the crime was especially heinous, atrocious, or cruel; (3) that Long was previously convicted of a felony involving the use or threat of violence; and (4) that the crime was committed in a cold, calculated, and premeditated manner." *Long*, 610 So. 2d at 1272.

as the [postconviction] court's findings are supported by competent substantial evidence, 'this Court will not substitute its judgment for that of the [postconviction] court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given the evidence by the [postconviction] court.' " *Brown v. State*, 258 So. 3d 1201, 1206 (Fla. 2018) (quoting *Blanco v. State*, 702 So. 2d 1250, 1252 (Fla. 1997)).

As this Court has explained, to prevail on an Eighth Amendment method of execution challenge, "a condemned prisoner must: (1) establish that the method of execution presents a substantial and imminent risk that is sure or very likely to cause serious illness and needless suffering and (2) identify a known and available alternative method of execution that entails a significantly less severe risk of pain." *Asay v. State* (*Asay VI*), 224 So. 3d 695, 701 (Fla. 2017) (citing *Glossip v. Gross*, 135 S. Ct. 2726, 2737 (2015); *Baze v. Rees*, 553 U.S. 35, 50 (2008) (plurality opinion)); *see also Bucklew v. Precythe*, 139 S. Ct. 1112, 1129 (2019) ("(re)confirm[ing] that anyone bringing a method of execution claim alleging the infliction of unconstitutionally cruel pain must meet the *Baze-Glossip* test").

In Long's case, competent, substantial evidence supports the postconviction court's findings that he failed to make either of the required showings. Specifically, in finding that Long failed to establish that the use of etomidate presents a substantial and imminent risk that is sure or very likely to cause serious

- 9 -

illness and needless suffering, the postconviction court found the testimony of the

State's expert, Dr. Yun, "to be more credible" than that of Long's expert, Dr.

Lubarsky:

> The Court finds credible Dr. Yun's testimony that the massive dose of 200 milligrams of etomidate would produce such a deep state of burst suppression and unconsciousness that it would eliminate any possible seizure activity, and render a person—even someone with traumatic brain injury and/or temporal lobe epilepsy—unaware of noxious stimuli. Even if Defendant had a seizure, the Court finds credible Dr. Lubarsky's testimony that the seizure itself is not painful, as well as Dr. Yun's testimony that Defendant would be unconscious and insensate. The Court further finds more credible Dr. Yun's testimony that 200 milligrams of etomidate would render a person unconscious for at least 30 minutes, rather than the maximum of 8 minutes asserted by Dr. Lubarsky. The Court further finds the possible risks associated with the "cascade of events" described by Dr. Lubarsky is highly speculative. Defendant has not shown that if he is administered 200 milligrams of etomidate, he is likely to have a seizure, even a partial undetectable seizure as described by Dr. Wood. And, although Defendant has been diagnosed with TBI and temporal lobe epilepsy, there is no testimony or evidence reflecting that Defendant has a history of the pronounced or violent seizures that would dislodge his IV lines, or any seizure history at all.[n.3] Even if Defendant had such a seizure, the lethal injection protocol requires that an inmate be restrained and the IV lines taped.
>
> > [N.3] The Court further notes that during the penalty phase, defense expert Dr. Money, who diagnosed Defendant with temporal lobe epilepsy, testified that temporal lobe epilepsy does not cause seizures but causes one to enter an altered state of consciousness. *See Long*, 610 So. 2d at 1271.

Although Long argues that events during recent executions discredit the

testimony on which the postconviction court relied because "it is clear that inmates

were not sufficiently anesthetized," these are the type of "speculative and conclusory allegations" that we have held are insufficient to warrant an evidentiary hearing, let alone relief. *Jimenez*, 265 So. 3d at 475. Moreover, we have repeatedly recognized that DOC is entitled to the presumption that it will comply with the lethal injection protocol, *see, e.g.*, *Muhammad v. State*, 132 So. 3d 176, 203 (Fla. 2013), and the protocol includes safeguards to ensure the condemned is unconscious throughout the execution.

Regarding the second required showing, Long argues that Florida's refusal to try to obtain alternative drugs pentobarbital and fentanyl does not mean that they are not feasible or available. However, competent, substantial evidence supports the postconviction court's finding that Long failed to identify a known and available alternative method of execution that entails a significantly less severe risk of pain. Specifically, the postconviction court found that the existence of protocols in other states using pentobarbital

> do[es] not demonstrate that pentobarbital is feasible and readily implemented here in Florida. The Court finds credible Mr. Whitfield's testimony that neither pentobarbital nor fentanyl is readily available to DOC. Although [defense expert] Dr. Raymond's testimony reflected that pentobarbital or fentanyl could be purchased or compounded by a licensed, registered Florida pharmacist, he did not testify that those medications are available for purchase by DOC or that those medications meet the FDA criteria for compounding. As in *Bucklew*, Defendant's allegations regarding pentobarbital and fentanyl rest on unsupported speculation and are affirmatively contradicted by the evidence. The Court further finds Defendant has failed to present any testimony or evidence that the use of either

- 11 -

pentobarbital or fentanyl entails a significantly less severe risk of pain.

Accordingly, we affirm the postconviction court's denial of this claim.

**(B) Three-Drug Protocol**

In his second challenge to Florida's lethal injection protocol, Long argues that the postconviction court erred in summarily denying his claim that Florida's use of a three-drug protocol instead of a one-drug protocol violates evolving standards of decency under the Eighth Amendment. The postconviction court did not err. As we have explained, "Florida's current protocol does not violate the constitution simply because other states have altered their methods of lethal injection." *Muhammad*, 132 So. 3d at 196-97 ("[B]efore it could be said that Florida must adopt a one-drug protocol, the current three-drug lethal injection protocol must be determined to present 'a substantial risk of serious harm' under *Baze*."); *see also Jimenez*, 265 So. 3d at 475 ("[W]e have consistently rejected [the] challenge that the DOC should substitute the current three-drug protocol with a one-drug protocol.") (quoting *Hannon v. State*, 228 So. 3d 505, 509 (Fla. 2017)).

**(C) Use of Etomidate**

In his final challenge to the lethal injection protocol, Long argues that the postconviction court erred in summarily denying his claim that Florida's use of etomidate as the first of three drugs in the protocol places him at substantial risk of serious harm in violation of the Eighth Amendment. He further urges this Court to

remand for an evidentiary hearing to review the use of etomidate. The postconviction court properly summarily denied this claim.

Since approving the current lethal injection protocol in *Asay VI*, we have repeatedly affirmed the summary denial of challenges to the protocol, including challenges to the use of etomidate as the first drug in the protocol. *See, e.g.*, *Jimenez*, 265 So. 3d at 474; *Hannon*, 228 So. 3d at 508-09. Neither disagreement among experts about the risks associated with etomidate nor "speculative and conclusory" allegations regarding whether reactions to etomidate occurred during recent executions "require revisiting [this Court's] holding in *Asay VI* approving the constitutionality of lethal injection as currently administered in Florida." *Jimenez*, 265 So. 3d at 475 ("[I]t is impossible to know whether Branch's actions were in protest of his execution or a reaction to etomidate, such as the 'transient venous pain on injection and transient skeletal movements, including myoclonus' recognized among the 'most frequent adverse reactions' in *Asay VI*, 224 So. 3d at 701.").

Accordingly, we affirm the summary denial of this claim.

### (3) Length of Time on Death Row

Long next argues that the postconviction court erred in summarily denying his claim that adding his execution to the more than 30 years he has spent on death row constitutes cruel and unusual punishment in violation of the Eighth and

Fourteenth Amendments to the United States Constitution and binding norms of international law. We have repeatedly rejected similar claims, *see, e.g.*, *Gore v. State*, 91 So. 3d 769, 780 (Fla. 2012), and Long's arguments do not warrant receding from our precedent. Accordingly, we affirm the summary denial of this claim.

### (4) *Hurst*

In his fourth claim, Long argues that denying him the retroactive application of *Hurst v. Florida*, 136 S. Ct. 616 (2016), and *Hurst v. State*, 202 So. 3d 40 (Fla. 2016), *cert. denied*, 137 S. Ct. 2161 (2017), violates the Eighth and Fourteenth Amendments. Long previously—and unsuccessfully—sought relief from his sentence of death pursuant to the *Hurst* decisions. *See Long v. State*, 235 So. 3d 293 (Fla.), *cert. denied*, 139 S. Ct. 162 (2018). Accordingly, as the postconviction court correctly ruled, Long's *Hurst* claims are untimely, successive, and procedurally barred. Therefore, we affirm their summary denial.

### (5) Defense Execution Witnesses

Long next argues that the postconviction court's refusal to require DOC to comply with certain of his requests pertaining to defense witnesses at his execution[6] violates his rights under the Sixth and Eighth Amendments to the

---

6. Long requested (1) that one of his designated legal witnesses be allowed access to a writing pad and pen during his execution; (2) that his designated legal witness be allowed access to a telephone before and during the execution process;

- 14 -

United States Constitution.  We disagree.  "The DOC is entitled to a presumption that it will properly perform its duties while carrying out an execution. . . . [and] our 'role is not to micromanage the executive branch in fulfilling its own duties relating to executions.' "  *Hannon*, 228 So. 3d at 509 (quoting *Troy v. State*, 57 So. 3d 828, 840 (Fla. 2011)); *see also* art. 2, § 3, Fla. Const. ("The powers of the state government shall be divided into legislative, executive and judicial branches.  No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein.").  Because Long has not demonstrated that DOC's existing policies and procedures violate his constitutional rights, mindful that separation of powers principles preclude us from performing the executive function of establishing a procedure to be used for executions, we hold that the postconviction court did not err in refusing to direct DOC to comply with Long's requests.

## (6) Categorical Exemption from Execution

As his sixth claim, Long argues that evolving standards of decency require that he be exempted from the death penalty because of his severe traumatic brain injury, which he contends is equivalent to severe mental illness.  We have previously rejected similar Eighth Amendment claims raised for the first time in

---

(3) that he be afforded a second witness to his execution; and (4) that one of his witnesses be allowed to view the IV insertion process.

postconviction proceedings as untimely, procedurally barred, and without merit. *See, e.g.*, *Carroll v. State*, 114 So. 3d 883, 886 (Fla. 2013); *Simmons v. State*, 105 So. 3d 475, 510-11 (Fla. 2012); *Johnston v. State*, 27 So. 3d 11, 26 (Fla. 2010). Long's arguments, raised in his *third* successive postconviction motion, do not warrant receding from our precedent. Accordingly, we affirm the postconviction court's denial of this claim.

### (7) Public Records

In his final claim, Long challenges the postconviction court's rulings on his post-warrant public records requests to three agencies pursuant to Florida Rule of Criminal Procedure 3.852(i). Specifically, Long argues that the postconviction court violated his rights to due process and equal protection under the Fourteenth Amendment to the United States Constitution and the corresponding provisions of the Florida Constitution because the postconviction court denied him a fair opportunity to show that his execution will violate the Eighth Amendment (1) by refusing to require that the medical examiner, the Florida Department of Law Enforcement (FDLE), and DOC either deposit the requested records in the repository or state, in an affidavit pursuant to rule 3.852(h), that the requested items do not exist; (2) by ruling that some of his requests related to his challenges to Florida's lethal injection protocol were overbroad and would not lead to a colorable claim; and (3) by denying Long's request for an in-camera inspection of

responsive documents that existed but to which Long was denied access. We review the postconviction court's rulings for abuse of discretion, *see Hannon*, 228 So. 3d at 511, and find none.

Firstly, Long's public records requests to the agencies at issue were pursuant to rule 3.852(i). That rule is entirely separate from and does not impose the affidavit requirement of rule 3.852(h)(3). *See* Fla. R. Crim. P. 3.852(i) (establishing procedure for "obtain[ing] public records *in addition to*" those provided under various other subdivisions of rule 3.852, including subdivision (h)) (emphasis added); *see also Hannon*, 228 So. 3d at 511 (explaining the different purposes and requirements of rule 3.852(h) and (i)). But even if rule 3.852(h)(3) did apply, which it does not, its affidavit requirement would not have been triggered on the facts of this case, where the postconviction court sustained the objections of two of the agencies in their entirety and the third agency produced specific records as ordered by the postconviction court. *See* Fla. R. Crim. P. 3.852(h)(3) (requiring an affidavit only where there is no public record since the defendant's last public records request to the agency at issue "(A) that was not previously the subject of an objection; (B) that was received or produced since the previous request; or (C) that was, for any reason, not produced previously"). Moreover, to the extent that Long is generally complaining that certain records have not been deposited in the repository in the 20-plus years that the registry has

existed, he has had decades to pursue this claim, and, in any event, this "Court has long acknowledged that the public records procedure under Florida Rule of Criminal Procedure 3.852 'is not intended to be a procedure authorizing a fishing expedition for records unrelated to a colorable claim for postconviction relief.' " *Muhammad*, 132 So. 3d at 200 (quoting *Valle v. State*, 70 So. 3d 530, 549 (Fla. 2011)).

Secondly, the postconviction court's ruling that Long's requests related to his challenges to Florida's lethal injection protocol—other than requests pertaining to certain of his medical records—were overbroad and would not lead to a colorable claim is consistent with our precedent. *See Hannon*, 228 So. 3d at 511-12 ("[P]roduction of records relating to lethal injection are 'unlikely to lead to a colorable claim for relief [when] the challenge to the constitutionality of lethal injection as currently administered in Florida has been fully considered and rejected by the Court.' ") (quoting *Walton v. State*, 3 So. 3d 1000, 1014 (Fla. 2009)).

Thirdly, and finally, in rule 3.852 proceedings involving capital postconviction public records production, the postconviction court has the authority—but is not required—to conduct an in-camera inspection. *See* Fla. R. Crim. P. 3.852(j)(2) ("In proceedings under this rule the trial court *may* . . . conduct an in-camera inspection[.]") (emphasis added). The postconviction court acted

within its discretion here, where the additional records that Long requested related to his challenges to the lethal injection protocol and were, thus, unlikely to lead to a colorable claim given that the current protocol has been fully considered and approved.

## CONCLUSION

For the reasons above, we affirm the postconviction court's order denying Long's third successive postconviction motion pursuant to rule 3.851. Having fully considered the issues raised in this appeal, we deny Long's request for oral argument as moot. No rehearing will be entertained by this Court, and the mandate shall issue immediately.

It is so ordered.

CANADY, C.J., and POLSTON, LABARGA, LAWSON, LAGOA, and MUÑIZ, JJ., concur.
LUCK, J., concurs in part and concurs in the judgment with an opinion.

LUCK, J., concurring in part and concurring in the judgment.

I agree we should affirm the trial court's order denying Robert Joe Long's third successive motion for postconviction relief, and I agree that for all but one of Long's claims we should affirm for the reasons given in the majority opinion. The one exception is Long's fifth claim. I would affirm because the claim is not ripe for our review.

Long, in his fifth claim, alleged that he sent a letter to the prison warden requesting that: (1) his designated legal witness be allowed access to a pen and pad during the execution; (2) his legal witness be allowed access to a telephone before and during the execution; (3) he be afforded a second witness to the execution; and (4) one of his witnesses be allowed to view the intravenous insertion process. Long alleged that he "anticipates the grant of his request for his designated witness to be allowed access to writing implements and the denial of all other requests," and based on the anticipated denial, the department would be violating his Sixth and Eighth Amendment rights.

The state, in response, argued that the claim should be summarily denied and questioned "whether this claim is ripe for review and/or appropriately raised in a successive postconviction motion." The trial court denied Long's fifth claim, noting that "postconviction counsel asserts only that he *anticipates* [the department of corrections] will deny his requests, therefore, this claim may be premature."

On appeal, the state again "questions whether this claim is ripe for review and/or appropriately raised in a successive postconviction motion. As the lower court noted, Long asserts only that he *anticipates* the [department of corrections] will deny his requests, therefore, his claim may be premature."

I agree claim five is premature. Taking the allegations in Long's third successive postconviction motion as true, as we must, the department of

- 20 -

corrections has not ruled on Long's requests, and until it does, there has been no alleged violation of Long's constitutional rights. There is currently nothing for us to decide. *See* Philip J. Padovano, *Florida Appellate Practice* § 18:5 (2018 ed.) ("If the litigation is not yet complete, and if factual or legal decisions yet to be made may ultimately resolve the issue in another way, the appellate court may conclude that the issue is not yet ripe for review and may decline to consider it on that ground. As a general principle, the appellate court will not make a decision on an issue that is not yet ripe for appellate review." (footnote omitted)).

We don't give advisory opinions on anticipated claims. *See Sarasota-Fruitville Drainage Dist. v. Certain Lands Within Said Dist. Upon Which Drainage Taxes for the Year 1952 Have Not Been Paid*, 80 So. 2d 335, 336 (Fla. 1955) ("It is a fundamental principle of appellate procedure that only actual controversies are reviewed by direct appeal. We have repeatedly held that this Court was not authorized to render advisory opinions except in the instances require or authorized by the Constitution." (citation omitted)); *see also* Padovano, *supra*, at § 1.3 ("[T]he Florida courts have held that an appellate proceeding may not be used as a method of obtaining the answer to an abstract legal issue. There must be a real and substantial dispute and there must be a present need for resolution. An appellate proceeding may not be used to obtain an advisory opinion on an issue that may be in dispute in the future. The appellate courts have an

independent duty to consider each of these issues in every case and to dismiss an appeal or petition that does not present a genuine controversy." (footnotes omitted)).  And we don't decide issues that are not ready for us to decide.  *See, e.g.*, *King v. State*, 211 So. 3d 866, 889 (Fla. 2017) ("The final matter raised in King's initial brief is that King *may be* incompetent by the time he is scheduled for execution. Individuals who lack the mental capacity to understand their pending execution and the reasons for it cannot be executed.  However, as King acknowledges, claims of future incompetence are not ripe until a death warrant has been issued for a given individual.  No warrant has been signed in this case; therefore, this claim is not properly before us at this time." (emphasis added) (citations omitted)).

I would affirm the denial of Long's fifth claim but I would do so on ripeness grounds rather than ruling on the merits as the majority opinion does.

An Appeal from the Circuit Court in and for Hillsborough County,
Michelle Sisco, Judge - Case No. 291984CF013346000AHC

Robert A. Norgard of Norgard, Norgard & Chastang, Bartow, Florida,

for Appellant

Ashley Moody, Attorney General, Tallahassee, Florida, and Stephen D. Ake, Senior Assistant Attorney General, and Christina Z. Pacheco, Assistant Attorney General, Tampa, Florida,

for Appellee